LA SUCESIÓN DE JOSÉ CRUET Y ARROYO, compuesta de su viuda doña RAMONA COLÓN y de sus legítimos hijos JULIO, MONSERRATE, DOMINGO, MARCOLINA, MARÍA y CARMEN CRUET Y COLÓN, demandante y apelante, *v.* IRIS MANDES Y CRUET e ISABELINO MANDES Y MONTES, éste último como supuesto padre de dicha menor IRIS, demandados y apelados.

No. 3774.—*Visto:* Febrero 4, 1926.　*Resuelto:* Julio 21, 1926.

1. APELACIÓN Y ERROR—REVISIÓN—CIRCUNSTANCIAS INDICATIVAS DE ALEGADA PASIÓN Y PREJUICIO.—Interpretada la actuación del juez inferior en este caso en conexión con las circunstancias que la rodearon y a la luz de la ley aplicable al referido caso, se resolvió ella no demostraba pasión o prejuicio alguno por su parte.

2. PATERNIDAD Y FILIACIÓN—DE LOS HIJOS LEGÍTIMOS—ACCIÓN PARA IMPUGNAR LA LEGITIMIDAD—APELACIÓN— REVISIÓN— CUESTIONES DE HECHO—APRECIACIÓN DE LAS PRUEBAS POR LA CORTE INFERIOR.—Atendida la prueba de este caso *se resolvió:* que la corte inferior no cometió error alguno al apreciarla.

3. APELACIÓN Y ERROR—REVISIÓN—CUESTIONES DE HECHO, VEREDICTOS Y CONCLUSIONES—CREDIBILIDAD, EFECTO Y PESO DEL TESTIMONIO DE TESTIGOS—INCUMBENCIA *(Province)* DEL TRIBUNAL DE DERECHO.—La credibilidad de los testigos y el efecto y peso de la prueba cuando ésta fuere contradictoria, son cuestiones de hecho a resolver por la corte inferior.

SENTENCIA de *Gabriel Castejón,* J. (Guayama), declarando sin lugar la demanda, sin costas. *Confirmada.*

*José J. Aponte* y *R. Rivera Zayas,* abogados de la apelante; *José J. Acosta Acosta* y *José E. Figueras,* abogados de los apelados.

EL JUEZ ASOCIADO SEÑOR HUTCHISON, emitió la opinión del tribunal.

Los demandantes apelan de una sentencia declarando sin lugar la demanda y como base para la revocación de la sentencia alegan que la corte cometió error manifiesto e incurrió en prejuicio en la apreciación de la prueba. La "relación del caso y opinión" emitida por el Juez de Distrito dice así:

"Los demandantes en este caso son parte de los herederos de don José Cruet y Arroyo quien falleció en Guayama, P. R., bajo testamento abierto el día 14 de junio de 1922.

"Pretenden los demandantes por medio de esta acción que se declare inexistente la legitimación hecha por Victoria Cruet Colón hija y hermana respectivamente de los mismos, de una niña de nombre Iris la cual figura inscrita en el Registro Civil como hija legítima de la referida Victoria Cruet y de su esposo Isabelino Mandes, solicitándose a la vez la nulidad de dicha inscripción.

"Para sostener sus pretensiones alegan los demandantes que dicha niña, la demandada Iris Mandes Cruet, no es hija legítima de los esposos Cruet Mandes que la reconocieron y legitimaron como tal, sino hija natural de una señora de nombre Antonia Rivera quien la procreó con un individuo llamado Juan Montero habiendo sido recogida por doña Victoria Cruet de Mandes cuando la madre trataba de ahogar a la niña en el río Guamaní debido a encontrarse en aparente estado de enajenación mental.

"Que don José Cruet padre de Victoria Cruet, la persona que legitimó a la niña Iris, falleció en Guayama y que tal legitimación merma los derechos de los demandantes a la herencia ,de su esposo y padre.

"Con el propósito de probar los hechos alegados se ha presentado prueba documental creditiva de la inscripción en el Registro Civil de la niña Iris como hija legítima de Isabelino Mandes y Montes y de Victoria Cruet Ramos, certificaciones de defunción del causante José Cruet; de su hija Victoria, y de Antonia Rivera la supuesta madre de la niña con más copias del testamento de José Cruet y prueba testifical.

"Todo el peso de este caso se hace descansar en tal prueba testifical tendiendo la misma a demostrar las alegaciones de la demanda.

"Este es un caso especial en que se trata de privar a una niña de doce a quince años de edad de sus derechos de legitimación y con ellos de la parte de herencia de su abuelo a la que tiene derecho en representación de su madre legítima Victoria Cruet según consta

en el Registro Civil, y dada la importancia del caso y los resulta-
dos que habrían de derivarse de la resolución del mismo, entende-
mos que la prueba debe ser tan robusta y convincente que no deje
duda alguna en nuestro ánimo con respecto a la certeza de la misma.

"Manresa en el tomo 1º pág. 520 de su obra Comentarios al Có-
digo Civil al analizar la prueba necesaria para probar la legitima-
ción nos dice:

" 'La experiencia ha hecho conocer los peligros e inconvenientes
de la prueba testifical, sobre todo cuando ha fallecido la persona a
quien se atribuye la paternidad.'

"En el presente caso tenemos fallecidas a ambas madres no sólo
la que se alega como legítima si que también aquella a quien se im-
puta la falsa legitimación que hoy se combate, quedando toda la
prueba en manos de personas extrañas en absoluto a la niña deman-
dada a las que no les unen vínculos algunos de afecto con ella, siendo
de notar además que el presunto padre natural tampoco ha apare-
cido ignorándose su paradero, quedando por tanto esta niña entre-
gada en todo a los enemigos de sus derechos pues aún Isabelino
Mandes su padre legítimo según el Registro y la persona que la
inscribió como su hija viene hoy a la Corte a declarar en contra de
sus propios actos, haciendo causa común con los demandantes para
conseguir con ello lo que ha de privar a la niña Iris de su apellido
y de los derechos a la herencia de su abuelo.

"¿Podríamos en tal situación y fundados en dicha prueba dictar
una sentencia contra una niña indefensa satisfaciendo los dictados
de nuestra conciencia?

"No, en modo alguno.

"Si tuviéramos ante nosotros a doña Victoria Cruet, si la voz de
Antonia Rivera la madre que se alega como legítima viniera a re-
clamar los derechos maternales sobre su hija Iris, si el padre ig-
norado Juan Montero alegare su condición de padre natural, qui-
zás variaríamos nuestra opinión pero negarle derechos adquiridos
por la niña Iris al amparo del Registro Civil y por una posesión de
hija legítima por doce o trece años, darle por madre una pobre loca
fallecida y un padre ignorado de cuyas paternidades tenemos gran-
des dudas y así la tienen también los demandantes que en su de-
manda no afirman categóricamente tal hecho sino que lo hacen por
información y creencia, es lo que nos parece muy duro y muy con-
trario a la vez a los principios de una estricta y completa justicia.

"Al hacer el estudio de este asunto hemos encontrado muy po-
cos casos análogos al presente.

"El Tribunal Supremo de España en una sentencia de cinco de

enero de 1900 si bien analizando preceptos del antiguo Código Civil derogados actualmente, expresa su opinión en esta materia en la siguiente forma: 'que el estado de un hijo reconocido y que como tal se haya en posesión del mismo dentro de una familia no puede ser anulado sin justificación cumplida de que el supuesto hijo tiene un estado conocido distinto o de que no ha podido ser engendrado por el· que lo reconoció cuando sólo de la paternidad se trate aun cuando el mismo padre así lo afirme posteriormente contradiciendo sus actos anteriores.'

''Principios que por la bondad y sabiduría de los mismos creemos aplicables a este caso en que no está definido el estado distinto de la niña Iris como hija de una loca y de un padre desconocido y en que el padre Isabelino Mandes no ha demostrado su imposibilidad para enjendrar tal hijo ni tampoco la de su esposa, cuya paternidad ha negado no obstante haberla reconocido como tal hija legítima en el Registro Civil, siendo de notar además que la posesión de estado de hija legítima por parte de la niña Iris data de doce a trece años y se le quiere privar ahora de ella cuando su madre doña Victoria Cruet ha muerto, sin respeto alguno para la voluntad de ésta ni por parte de su madre y hermanos ni aún más de su esposo Isabelino Mandes partícipe en el reconocimiento.

''Y entrando en el espíritu que integra el Código Civil Español y que es la fuente de nuestro derecho sustantivo civil aunque ciertos preceptos no estén hoy vigentes diremos con Manresa, tomo 1º pág.·522:

'' ''Con estos datos, no de teoría, sino de positiva legislación, *se comprenderá el carácter restrictivo de nuestro Código, cuyos redactores tuvieron presente, sin duda, para adoptar este temperamento, las razones de prudencia que siempre en estos casos se alegan para evitar litigios escandalosos o perturbaciones inútiles y maliciosas en las familias.* Aun cuando la realidad abona con hechos de otros países contra este temor, aún pudiera alegarse aquellos motivos para huir de una tan absoluta libertad como la del Código bávaro; mas no ciertamente para términos medios como el del Código de Napoleón y nuestra Ley de matrimonio civil, *considerando que las leyes deben al favorecimiento de la parte más débil, que es el hijo, y que con tribunales prudentes y experimentados es más difícil de lo que parece lograr el triunfo de una pretensión contraria a la ·verdad.'* (Lo subrayado es nuestro).

''Siendo estos principios sostenidos en sustancia por nuestra jurisprudencia ya que en el caso de Alcaide vs. Morales, 28 D.P.R. 291, nuestra Corte Suprema se expresa así:

" 'Claro es que la prueba que se aporte tiene que ser de tal manera robusta y convincente que al anular el reconocimiento voluntario, hecho, la Corte quede plenamente convencida de que esa y no otra es la resolución que impone la justicia.'

"Al amparo de tal doctrina y velando por los intereses de una pobre niña indefensa, creemos que los fines de la equidad y la justicia se cumplen mejor en este caso declarando sin lugar la demanda sin especial condenación de costas."

[1] En la relación citada no hallamos indicios de pasión o prejuicio. Tampoco invocan los apelantes nada de lo que dijo el juez sentenciador al resolver el caso, sino que mencionan ciertas preguntas y manifestaciones hechas por él durante el juicio.

Si hubiesen ocurrido estos incidentes en una controversia corriente entre partes más o menos equilibradas y en un caso en el cual no estuviere envuelta cuestión alguna de política pública, la contención de los demandantes merecería un poco más de consideración. En el presente caso, sin embargo, la actuación de que se quejan no puede desprenderse de su marco y considerarse por sí sola, sino que debe interpretarse en conexión con todas las circunstancias que la rodean y a la luz de la ley aplicable a esta clase de casos. La demanda en este caso fué radicada el 19 de diciembre de 1924. En ella se alega que el demandado, Isabelino Mandes, compareció personalmente el día 14 de marzo de 1914 en el Registro Civil de Guayama e hizo inscribir el nacimiento de una niña llamada Iris como hija legítima de él y de su esposa Victoria Cruet Colón, y como que había nacido el día 17 de febrero del mismo año; que al tiempo de la inscripción el mencionado Mandes manifestó e hizo que se hiciera constar, entre otras cosas, que los abuelos maternos de la niña eran José Cruet y Ramona Colón; que Mandes hizo esto a sabiendas de que la mencionada niña no era hija legítima de él y de su esposa Victoria Cruet, como se hizo constar; y que José Cruet y Ramona Colón no eran los abuelos maternos, ya que Mandes y su esposa Victoria Cruet no tenían ningún hijo que

viviera, en aquel entonces. Los demandantes también alegan por información y creencia que la niña Iris, era hija natural de una tal Antonia Rivera y de un individuo llamado Juan Montero; y que había nacido en una casa o ranchón de madera propiedad de don Bautista Soto, sito en el Barrio de Guamaní, en fecha anterior a la mencionada en el registro civil; que la niña Iris fué recogida por doña Victoria Cruet esposa de Mandes, en momentos en que la madre de la niña, que se había vuelto loca, trataba de ahogarla en el Río Guamaní; que doña Victoria Cruet murió en Guayama el día 8 de agosto de 1920, sin haber dejado descendientes, sucediéndole sus padres, José Cruet y Ramona Colón; que la verdadera madre de Iris murió en Guayama el día 15 de mayo de 1913; que José Cruet también falleció en Guayama el 14 de junio de 1922, dejando bienes y bajos testamento, en el cual instituyó a los demandantes y a la mencionada Victoria Cruet como sus únicos y universales herederos; y que teniendo los demandantes que dividir la herencia de su expresado causante don José Cruet y Arroyo, no lo han podido verificar porque para ello se hace necesario ventilar este caso ante la corte para que se declare inexistente el estado de hija legítima de la niña Iris como descendiente de los esposos Isabelino Mandes y Victoria Cruet, por el motivo de que es incierto el hecho de la inscripción de nacimiento como hija legítima de los cónyuges Mandes-Cruet y sin causa legal que lo justifique; y subsistiendo tal inscripción ello daría derecho a la niña Iris en la herencia de su supuesto abuelo el fenecido don José Cruet y Arroyo, en representación de su supuesta legítima madre doña Victoria Cruet, fallecida también, y con la inscripción de referencia se perjudica el derecho de la viuda doña Ramona Colón, madre legítima de doña Victoria Cruet, que es su heredera forzosa, como también el derecho de los demás legitimarios del causante José Cruet y Arroyo, según los hechos precedentemente alegados.

El emplazamiento fué diligenciado con fecha 7 de enero de 1925.

El 14 de enero los demandantes solicitaron el nombramiento de un tutor *ad litem,* basados en el inciso segundo del artículo 27 del Código de Enjuiciamiento Civil, alegando únicamente el hecho de que la demandada Iris Mandes era menor de catorce años. Esta moción termina así: ''En tal virtud esta parte suplica a la Hon. Corte que se le nombre a la menor Iris Mandes y Cruet, demandada en este caso, como defensor judicial, a su tío carnal don Francisco Aponte, para que como tal defensor comparezca a defender los derechos de dicha menor en esta contención, por carecer la misma de madre que la represente, pues según alegan los demandantes en su demanda la madre de dicha niña falleció hace algún tiempo, digo algunos años. Dicho Sr. Aponte es mayor de edad y vecino de esta ciudad.''

El 23 de enero el juez de distrito nombró al fiscal tutor *ad litem* y en la misma orden le instruyó hacerse cargo de la defensa de la menor. El mismo día se notificó esta orden al fiscal.

La acción fué presentada contra Isabelino Mandes individualmente y como supuesto padre de Iris Mandes. Con fecha 18 de abril los demandantes solicitaron se anotara la rebeldía de Isabelino Mandes en su doble carácter y el 20 del mismo mes, el secretario anotó la rebeldía solicitada.

Cuando se llamó el caso para juicio el 24 de abril, el fiscal no había ni excepcionado ni contestado la demanda.

El primer testigo de los demandantes fué el demandado Isabelino Mandes, quien, sin objeción u oposición de parte del fiscal en ningún momento, ni intervención alguna del juez sentenciador, declaró prácticamente sobre todos los hechos alegados en la demanda. La única información adicional suministrada por este testigo fué al efecto de que él hizo de buena fe que se hiciera el asiento en el registro civil y que después consultó un abogado, Celestino Domínguez, respecto

a este asunto y que éste le aconsejó que consultara con la corte, y que él quería muchísimo la niñita, como si fuera su propia hija. Él no explicó por qué no siguió el consejo dádole por Domínguez ni dice tampoco si consultó o no un abogado con referencia a sus propios derechos o los de la otra demandada en este caso, ni se le preguntó respecto a alguna de estas materias.

El examen superficial de repreguntas hecho por el fiscal y las preguntas y manifestaciones del juez sentenciador, criticadas por los apelantes, son como sigue:

"Hon. Fiscal: ¿Cuál es el motivo de Ud. alegar que no es hija suya?—Porque ellos quieren hacer el testamento del viejo.—¿Quiénes quieren hacer el testamento?—Los herederos, los hijos de don José Cruet.—¿Ud. conoció al padre de esa niña?—El padre era Juan Montero, que tuvo esa hija en esa señora.—¿Ud. conoce los padres de esa niña?—Sí señor, murió la madre.—¿El padre vive?— Vive en Vega Baja, pero es casado.—¿Qué edad tenía la niña cuando Ud. la inscribió?—Me parece que tenía treinta y cinco días de que estaba en casa.—¿Con quién vive la niña en la actualidad, con Ud? —Sí señor, yo siempre le he dado todo lo que ha necesitado.—Nada más.—Hon. Juez: ¿Por qué Ud. ha esperado a hacer eso ahora; por qué no lo hizo Ud. antes?—Debía haberlo hecho antes.—¿Ud. es viudo, no?—Sí señor.—¿De tal manera que a su señora quién la hereda hoy, tal como están las cosas?—Sus familiares.—¿Pero hoy, siendo esa niña hija legítima, quien la heredaría, no sería Iris?— Sí señor.—¿De tal manera que hoy lo que se quiere es desheredar a Iris? Y si Ud. lo hubiese hecho antes su esposa tal vez la hubiera adoptado o le hubiera dado un legado.—Debía haberlo hecho antes.— ¿Y no lo hizo para reventar a esa chiquita? Ese es el punto; y hoy, muerta la madre no se puede hacer nada e Iris se queda en la calle. . . . . Puede irse.—Repreguntado por el Licdo. Aponte: ¿Ud. no vive en un pedacito de terreno que era lo de Victoria su esposa? —Sí señor.—¿Ud. sabe fijamente que ese pedazo de terreno se lo van a dar a Iris?—Sí señor.—Nada más.—Repreguntado por el Hon. Juez: ¿Qué bienes dejó su esposa?—Siete cuerdas y media de terreno con casa.—¿No dejó nada más?—Eso fué lo que teníamos nosotros y eso al morir ella como estaba en nombre del padre. . . . . No, ¿pero los bienes de Ud. y su esposa?—Esos eran los bienes.— Con eso lo que han hecho es reventar a esa chiquita. ¿Ud. dice que

la quiere como padre?—Sí señor, la quiero como hija.—Puede retirarse.''

Éste es el más serio de los incidentes sobre que los apelantes basan su alegación de pasión y prejuicio. A Mandes se llamó nuevamente a la silla de los testigos en un estado más avanzado del juicio y fué una vez más preguntado por el juez sentenciador, quien también hizo una o dos preguntas similares, aunque en forma mucho más suave, a uno de los demandantes que también declaró como testigo.

Debe admitirse y se admite que la conducta del juez sentenciador no demuestra ninguna inclinación a favor de los demandantes. Pero la corte se confrontó con una situación difícil y embarazosa. La situación en que se había colocado a la niña Iris fué un aspecto del caso que podía conmover profundamente la conciencia así como el corazón de cualquier juez de mente abierta.

No se hizo ciertamente ningún esfuerzo para ocultar lo que estaba en la mente de la corte. Un juez deshonesto tal vez hubiese sido más discreto. La exaltación de que se trata no puede recomendarse como un ejemplo de la actitud mental que caracteriza un temperamento judicial sereno. No obstante, tomando todo en consideración, estamos convencidos de que en el presente caso todo lo que dijo e hizo el juez de distrito puede considerarse tan sólo como una advertencia oportuna a los demandantes de que a ellos incumbía establecer su demanda con prueba robusta y convincente. Indudablemente esa es la ley, según resolvió esta corte en el caso de *Alcaide* v. *Morales,* invocado por la corte inferior y basado en las decisiones de la Corte Suprema de España que allí se citan.

[2, 3] La evidencia, como ya hemos mencionado, debe ser apreciada según parece haber sido considerada por la corte inferior, desde el punto de vista de la ley que rige este caso.

El tutor *ad litem* no ofreció evidencia alguna en defensa

de los demandados y cuando se le preguntó al final del juicio qué tenía que decir, hizo la siguiente manifestación:

"Hon. Fiscal:—Yo no puedo en estos momentos. A mí me parece *prima facie* que el Sr. Mandes está *estoppel* para pedir la nulidad de la inscripción de esta muchacha. Figúrese su señoría que esta muchacha de hija legítima se va a convertir en hija adulterina! Yo no estoy en condiciones de informar ahora definitivamente."

Entonces el juez concedió diez días al fiscal para presentar un alegato y otros diez días a los demandantes para contestar el mismo.

Ciertamente que no se llegó a una conclusión rápida y prematura, sino que el asunto estuvo considerándose y el resultado fué anunciado después de un mes o seis semanas de deliberación concienzuda, según se desprende de la opinión emitida a la terminación de ese período y citada al principio de esta opinión.

Estamos enteramente de acuerdo con el resultado a que llegó la corte inferior.

Los apelantes en su argumentación, sin ninguna otra razón que no sea el hecho de que no se ofreció prueba oral alguna por parte de los demandados, asumen, pero no consiguen demostrar en absoluto, que no hay conflicto en la prueba. El alegato pasa por alto enteramente lo fuerte de la posición defensiva ocupada por la verdadera demandada Iris Mandes basada en su estado civil *prima facie* según consta del asiento en el registro civil. Ese asiento dice como sigue:

'En Guayama, P. R., el día 19 de marzo de 1914, siendo las dos de la tarde, en virtud de la declaración a mí presentada por Isabelino Mandes, mayor de edad, de estado casado, profesión comerciante, natural de Guayama, avecinado en el barrio de Guamaní de Guayama, yo, Juan Alfredo Blondet, Encargado del Registro Civil, procedo a extender esta acta de nacimiento haciendo constar:—1.—Que a las nueve de la mañana del día 27 de febrero de mil novecientos catorce (1914) nació una niña de la raza blanca, a la que se le puso 'Iris.'—2.—Que dicha niña es hija legítima del declarante, cuyas circunstancias personales ya están consignadas y de su esposa

Victoria Cruet, mayor de edad, casada, dedicada a las ocupaciones propias de su sexo, natural de Guayama, y avecindada en el barrio de Guamaní de Guayama.—3.—Que los abuelos paternos son: Sebastián Mandes, natural de Guayama, ya difunto y Rosa Montes, natural de Guayama y avecinada en la calle de Luis Venega de Guayama dedicada a las ocupaciones propias de su sexo, y maternos José Cruet y Ramona Colón, naturales de Guayama, avecinados en la calle de Hostos de Guayama de oficio propietarios y dedicada a las ocupaciones propias de su sexo respectivamente.—4.—Que_____ 5.—Que el expresado Isabelino Mandes hizo la preinserta declaración en su carácter de padre de la referida niña.—6.—Que fueron testigos en este acto Gabriel Capó Cintrón, mayor de edad, de estado casado, de profesión empleado, natural de Guayama, y avecinado en la calle de Ashford de Guayama, casa No. 25 y José Juan Vidal, de estado casado, profesión empleado avecinado en la calle de Hostos de Guayama, casa No. 10, y habiendo leído los que en él figuran lo preinserto, dichos testigos declaran constarles su certeza y todos lo aprueban y ratifican y firman, de todo lo que yo, el Encargado del Registro Civil certifico.—Firmado: Isabelino Mandes, Gabriel Capó, José Juan Vidal y Juan A. Blóndet, Encargado del Registro Civil.''

Isabelino Mandes declaró que la niña tenía como una semana cuando su esposa y ''otro hombre'' impidieron que fuese ahogada. También manifestó al ser repreguntado (véase resumen *supra*) que la inscripción en el registro civil se hizo 35 días después de haber recogido la niñita. Claramente, sobre esta base el período máximo entre la fecha del nacimiento y la del registro serían como seis semanas. El asiento mismo especifica aproximadamente la mitad de este período en cuanto a ese hecho y puede considerarse como corroboración suficiente y substancial sobre este punto.

Sin embargo, desgraciadamente para los demandantes, el certificado de defunción de Antonia Rivera indica que ella murió el 15 de mayo de 1913, o sea unos diez meses antes de haber nacido Iris, según el principal testigo Mandes y según el registro civil.

Otra circunstancia curiosa es que Mandes se ajusta a la alegación de la demanda al manifestar que su esposa parti-

cipó en el salvamento de la niña y tomó posesión de ella en aquel entonces. Por otra parte el verdadero héroe en aquella ocasión no hace mención de que doña Victoria Cruet estuviese presente, sino que dice que más tarde Guadalupe Aponte, un tío de Antonia Rivera Aponte, le preguntó si quería la niña; que él rehusó tomarla porque su esposa le acababa de obsequiar con guares y le sugirió a su tío que le diera la niña a doña Victoria; que entonces su tío "fué y habló con" doña Victoria; que el testigo vió a Guadalupe Aponte entregar la niña unas tres semanas después y que Antonia Rivera falleció en aquel entonces. Este testigo también dice que sabe cuál es la edad de Iris Mandes, porque los guares nacieron en 1912, más o menos en la época en que se intentó el infanticidio.

El apellido del testigo mencionado últimamente es sugestivo de una relación familiar con otro testigo cuyo testimonio, a fin de que hable por sí mismo, citaremos en su totalidad:

"Estefanía Poventud declara bajo juramento, examinada por el Licdo. Aponte: — ¿Cómo se llama Ud.? — Estefanía Poventud.— ¿Dónde vive Ud.?—En la Planta.—¿De qué pueblo?—De Guayama. —¿Ud. conoció a doña Victoria Cruet?—Sí señor.—¿Conoce a don Isabelino Mandes?—También.—¿Conoció Ud. a doña Antonia Rivera Aponte?—No la conocí; la ví cuando estaba loca en dos ocasiones.—Y a Juan Montero, ¿lo conoció Ud.?—Sí señor.—¿Ud. conoce algo que se relacione con el nacimiento de la niña Iris?—Yo lo único que conozco solamente es que esa niña cuando se la entregaron a Isabelino Mandes y Victoria Cruet era bien pequeña y yo estaba en la casa y yo era quien la cuidaba, y a mí misma ellos me decían que nunca le hiciera saber que ellos no eran sus padres; siempre me lo estaban nombrando.—¿De manera que Ud. sabe que ella no era hija de ellos?—No señor, no era hija de ellos; ellos la criaron.—¿Y la madre de esa niña Ud. la vió allí dos veces cuando estaba loca?—Sí señor.—¿Qué movimientos hacía ella allí?—Ella iba a mi casa y se sentaba en una hamaca y se daba unas mecidas, y había un tabique y decía que pasaba por allí.—Nada más.—Repreguntada por el Hon. Fiscal:—¿A quién vió Ud. allí?—A la madre de Iris.—¿La vió con la chiquita?—No, ya la habían entregado.— ¿Quién la entregó?—Yo no sé, yo estaba en la casa cuando ví lle-

gar a la casa a doña Victoria y me dice 'mira Yayita lo que me han traído los Reyes.'—¿De manera que en su concepto doña Victoria nunca tuvo hijos?—No señor, nunca.—Nada más.—Repreguntada por el Hon. Juez:—¿Qué edad tenía la chiquita esa cuando los Reyes a los Mandes?—No sé decirle.—¿Pero poco más o menos?—Yo sé que no tenía el mes de nacida.—¿Era chiquitita?—Chiquitita y coloradita que no se veía en los paños.—Puede retirarse."

Con excepción de Isabelino Mandes—que ha sido identificado como comerciante, de Julio Cruet, hijo de José Cruet, fenecido, y Eladio Ortiz, un peón—Estefanía Poventud es la única testigo en este caso, respecto de la cual hay algún indicio, siquiera remoto, de su ocupación, categoría social o responsabilidad financiera. Adolfo Poventud, Mandes y Estefanía Poventud son los únicos testigos oculares de la alegada entrega de la niña, si a Estefanía puede considerársele como tal. Mandes, como ya se ha dicho, declara que su esposa salvó la niña y la trajo a su casa unas cinco semanas antes de que se inscribiera su nacimiento. Adolfo, como también se ha dicho, declara que Guadalupe Aponte llevó la niña a la casa de Mandes más de un año antes de hacerse el asiento en el registro civil. Estefanía usa el plural pero no menciona nombres. Su aproximación más cercana a algo definido en este respecto está en la cita que hace de la manifestación atribuída a doña Victoria Cruet al efecto de que la niña era un regalo de los Tres Reyes.

Guadalupe Aponte, quien por lo menos tenía un techo para albergar su sobrina demente y quien es hermano de Francisco Aponte, candidato para ser nombrado tutor *ad litem* y prominente como testigo de los demandantes, se hizo conspicuo por su ausencia.

Francisco Aponte dice que conoció a Antonia Rivera, a Isabelino Mandes, a Victoria Cruet y a una niña llamada Iris, que estaba emparentada con él, siendo hija de su sobrina, Antonia Rivera y Aponte. Que el padre y la madre de Antonia Rivera eran Santos Rivera y Margarita Aponte; que el padre de Iris era Juan Montero; que la madre era

Antonia Rivera; que Juan Montero y Antonia Rivera vi-
vieron juntos; que el testigo nunca había tenido ninguna
conversación con la niña; que él había hablado con ella;
que ella le había preguntado y él le había dicho que él era
familia de ella; (al ser repreguntado) dice que sabe que
la niña no es hija de Mandes, "pero que ellos la criaron,"
desde que nació; que sabe que Antonia Rivera es la ma-
dre de la niña porque ella la tuvo en casa de una muchacha
llamada Francisca, esposa de Bautista Soto; que no sabe
nada del traslado de la niña a la casa de Mandes, pero que
"ellos la criaron;" que siendo la niña hija de Antonia Ri-
vera no puede serlo de la señora de Mandes; que no puede
asegurar que la niña no sea hija de la señora de Mandes.

Francisca Vicente declara: que conoció a Antonia Ri-
vera, quien vivía en una habitación que le alquiló el ma-
rido de la testigo; que conoció a Juan Montero, esposo de
Antonia Rivera; que también conoció a Isabelino Mandes
y a Victoria Cruet; que conoció a una niña llamada Iris;
que la niña estaba en el salón de la corte (señalándola); que
la niña nació en una habitación que le alquiló el marido de
la testigo a Juan Montero, marido de Antonia Rivera (en
respuesta a la pregunta) ."¿esposo o querido?", la testigo
contestó, "querido"; que Montero iba y venía; pero que
alquiló la habitación para Antonia Rivera; que la niña na-
ció en la habitación que ellos habitaban; que esto ocurrió
hace como doce años, más o menos, antes del juicio; que
la comadrona que atendió el parto fué Antonia Reyes, muerta
tres años antes del juicio; que unos nueve días después de
dar a luz la madre se volvió loca, y como el marido estaba
trabajando alquiló un peón para que la llevara a casa de
su tío, Guadalupe Aponte; que respecto a lo que ocurrió
después no sabe nada; que el peón se llamaba Eladio Ortiz.

Eladio Ortiz declaró que él había trasladado a Antonia
Rivera y a su niña de la casa de Bautista Soto a la del tío,
Guadalupe Aponte.

La declaración de Julio Cruet es clara e inequívoca. Tal

vez sea la declaración más digna de crédito, quizás la única digna de crédito, en el presente caso, en tanto que los hechos que él menciona le constan de propio conocimiento. Se refieren en su mayor parte, sin embargo, a cuestiones que no afectan el asunto principal en controversia. Este testigo dice que Iris no es hija de Victoria Cruet y que Victoria Cruet murió sin haber dejado hijo, alguno. Admite francamente que no conoció los padres de la niña, y no se le preguntó cómo obtuvo la información de que Iris era una hija de crianza o la forma en que él averiguó ese hecho, si tal cosa le constaba que era un hecho. En ausencia de tal demostración, la mera declaración de este testigo de que su hermana no tuvo hijos no es suficiente para destruir el estado civil de una persona según ha constado durante más de diez años en los libros del registro civil. Si hay algo de cierto en las declaraciones de los otros testigos de los demandantes, y especialmente en la declaración de Mandes acerca de su consulta con Domínguez, es lamentable para los apelantes que no se utilizara a Domínguez como testigo. Una palabra corroborativa de él sobre este punto hubiera valido más que toda la otra prueba en este caso, en lo que se refiere a la identidad de Iris Mandes como hija de Antonia Rivera Aponte.

Para los fines de esta opinión puede admitirse sin resolverse que la demanda aducía una causa de acción contra la demandada Iris Mandes en tanto en cuanto atacaba su estado *prima facie* como hija legítima de Victoria Cruet y solicitaba se hiciera la correspondiente cancelación en el registro civil. De ello no se desprende que la misma doctrina debe prevalecer respecto al estado similar de la niña como hija de Isabelino Mandes y la cancelación del asiento en su totalidad. Ni es necesariamente cierto que el asiento debe permanecer como un todo indivisible o de lo contrario ser cancelado en su totalidad.

El acta de defunción de Antonia Rivera demuestra que ella se había divorciado. Se desconoce la fecha del decreto

de divorcio así como la fecha del matrimonio entre Mandes y Victoria Cruet. En cuanto aparece de los autos Mandes puede muy bien haber sido el esposo de Antonia Rivera antes de contraer matrimonio con Victoria Cruet y el divorcio pudo ser concedido dentro de los 300 días del nacimiento de la niña concebida por Antonia Rivera, caso en el cual la supuesta hija natural podría más o menos concluyentemente presumirse que era hija legítima de Isabelino Mandes. *Núñez* v. *Lacot,* 32 D.P.R. 81. No es respuesta a esta sugestión decir que la posibilidad de tal combinación de circunstancias es algo remota. El punto verdadero es que la continuación o extinción del estado legal de Iris Mandes como hija legítima de Isabelino Mandes no depende necesariamente de la continauación o extinción de su estado legal como hija legítima de Victoria Cruet.

Isabelino Mandes ni por derecho propio ni como supuesto padre de Iris Mandes tenía ningún derecho a parte alguna de los bienes dejados por José Cruet al tiempo de su muerte. Asimismo, Iris Mandes no tenía derecho alguno sobre tales bienes con motivo de su parentesco con Isabelino Mandes. Por las mismas razones los demandantes no tenían interés en el estado legal de Iris Mandes como hija legítima de Isabelino Mandes, ningún derecho legítimo de investigar la paternidad de Iris Mandes, ni ninguna causa de acción contra Isabelino Mandes, ni como demandado individualmente ni como supuesto padre de Iris Mandes.

La decisión de este caso, sin embargo, no depende de alguna ni de todas las proposiciones mencionadas últimamente.

De acuerdo con toda la prueba de los demandantes ellos estaban dispuestos y en realidad habían convenido con Mandes en renunciar todo derecho a lo que Iris Mandes ya había recibido como herencia directamente de su madre. En lo que a tal herencia se refiere no puede alegarse, por consiguiente, que Mandes hizo ningún sacrificio financiero al servirles de testigo a los demandantes.

Iris Mandes como hija legítima de Victoria Cruet hu-
biera recibido a lo sumo de la Sucesión Cruet, de acuerdo
con la declaración de todos los testigos excepto la del pro-
pio Mandes, unos mil dólares ($1,000). Esta adjudicación
en dinero o como más frecuentemente sucede, en forma de
terrenos más o menos poco productivos, hubiera estado su-
jeta en su manejo y administración a las restricciones im-
puestas por la ley sobre el dominio y disposición de pro-
piedades pertenecientes a menores de edad. Mirando este
asunto desde un punto de vista puramente mercenario, las
ventajas pecuniarias que resultarían a Mandes de tal adju-
dicación serían insignificantes comparadas con la exonera-
ción de toda responsabilidad paternal en conexión con la
asistencia, mantenimiento y educación de su hija legítima
Iris, para no mencionar otras posibles consideraciones. No
obstante, el resultado directo del decreto solicitado en la
demanda, intentáranlo o nó los demandantes o el mismo Man-
des, sería relevar a este último de las cargas y responsabi-
lidades incidentales a la patria potestad.

Por tanto, nos es imposible asumir con los apelantes que
Mandes en realidad estaba declarando en contra de sus in-
tereses pecuniarios.

Pero sea esto como fuere, Mandes por su propia decla-
ración fué muy poco escrupuloso en lo que se refiere a sus
representaciones inexactas que él ahora dice fueron delibe-
radamente hechas por él "de buena fe" en 1914. Bajo la
teoría de que su última aserción sea cierta en lo que se re-
fiere a este primer incidente, no sabemos hasta cierto punto
cómo juzgar sus escrúpulos concienzudos que parecen ha-
ber surgido en época posterior a la muerte de su esposa y
antes de presentarse la demanda en este caso.

Por otra parte, si él dijo la verdad en 1914, su declara-
ción en la silla de los testigos once años después en el pre-
sente caso no puede en manera alguna ser cierta; y el fac-
tor más importante en este caso desde su principio hasta el

fin es la presunción a favor del estado legal que surge de las representaciones hechas por el mismo Mandes en 1914.

Una repetición gráfica del principio que debe regir este aspecto del caso ha sido citada con aprobación por esta corte en dos ocasiones anteriores. Puede hallarse en *Quevedo* v. *Pino,* 15 D.P.R. 686 y en *Rico* v. *López,* 21 D.P.R. 564.

*La sentencia apelada debe ser confirmada.*

Los Jueces Asociados señores Aldrey y Franco Soto, disintieron.

OPINIÓN CONCURRENTE EMITIDA POR EL JUEZ ASOCIADO SR. WOLF.

En sus puntos principales estoy de acuerdo con la opinión de esta corte. Quizás debería darse más énfasis al hecho de que en casos de esta índole, no es suficiente aún una probabilidad razonable en favor de los demandantes, sino que la prueba debe ser clara y convincente. Sin embargo, lo que en parte me ha inducido a emitir una opinión concurrente es que no veo cómo podía admitirse la declaración de Domínguez, el supuesto abogado de Mandes. Si era admisible, convengo en que el dejar de presentarlo tenía gran significación.

Igualmente baso mi opinión concurrente en otro punto, expuesto tan sólo parcialmente en la opinión principal. Estando vivo su supuesto padre y habiéndola inscrito como hija legítima, ninguno de los demandantes tenía interés alguno o capacidad para atacar el estado legal de Iris Mandes. En mi opinión, Mandes era el único ser viviente que tenía derecho a presentar tal acción. Los demandantes ante la ley no tenían nexo jurídico.

OPINIÓN DISIDENTE DEL JUEZ ASOCIADO SR. DE ALDREY, CON LA CUAL ESTÁ CONFORME EL JUEZ ASOCIADO SR. FRANCO SOTO.

Isabelino Mandes y Montes compareció en el Registro Civil de Guayama el 19 de marzo de 1914 e hizo inscribir el nacimiento de la niña Iris como ocurrido el 17 de febrero

del mismo año, como hija legítima suya y de su esposa Victoria Cruet Colón y como nieta de don José Cruet Arroyo. Doña Victoria Cruet Colón murió seis años después y dos años más tarde, el 14 de junio de 1922, falleció don José Cruet Arroyo, padre de doña Victoria Cruet. En 1924 la viuda de José Cruet Arroyo y los hijos de ese matrimonio demandaron a Isabelino Mandes y a la niña Iris alegando los anteriores hechos y, además, que al hacer Isabelino Mandes que la niña Iris fuera inscrita como hija legítima suya y de su esposa Victoria Cruet sabía que no era hija de ellos, pues no tenían hijos vivos en la fecha de la inscripción ni posteriormente, que creen de buena fe por información que tienen que la niña Iris es hija natural de Antonia Rivera y de Juan Montero habiendo nacido en una casa de Juan Bautista Soto en el barrio de Guamaní de Guayama: que Iris nació algún tiempo antes del que aparece en la inscripción de su nacimiento; que esa niña fué recogida por doña Victoria Cruet, esposa de Mandes, en momentos en que su madre, por su estado de enajenación mental, trataba de sumergirla en el río de Guamaní teniendo la niña entonces quince o veinte días de nacida, y que doña Victoria Cruet no dejó descendientes a su muerte pero sí ascendientes; que la verdadera madre de Iris es Antonia Rivera y murió en Guayama el 15 de mayo de 1913; y que teniendo los demandantes que dividir la herencia de don José Cruet Arroyo, muerto después que su hija doña Victoria, no han podido hacerlo porque se hace necesario que se declare inexistente el estado de hija legítima de la niña Iris toda vez que es incierta su inscripción como hija legítima y porque subsistiendo tal inscripción tendría derecho la niña Iris a heredar a don José Cruet Arroyo en representación de doña Victoria, perjudicándose con esa inscripción los derechos de la viuda e hijos de don José Cruet Arroyo. Por esas alegaciones solicitaron que se declarase inexistente el estado de hija legítima de la niña que consta en la inscripción de su nacimiento y nula dicha inscripción.

Los demandantes solicitaron de la corte de distrito que nombrase defensor judicial de la niña Iris a su tío carnal Francisco Aponte pero la corte nombró al fiscal del distrito, y anotada la rebeldía del demandado Isabelino Mandes sin que conste en la transcripción que tenemos contestación del defensor judicial nombrado, con la asistencia e intervención de éste se celebró el juicio recayendo después sentencia declarando sin lugar la demanda, la que motiva este recurso interpuesto por los demandantes.

El motivo alegado por los apelantes para sostener su recurso es que al declarar la corte sin lugar la demanda apreció la prueba con manifiesto error y prejuicio.

El prejuicio de un tribunal para resolver las cuestiones que se le someten para su decisión no está siempre basado en móviles impropios, incorrectos o bastardos en contra de una de las partes litigantes sino que puede ser producido por la naturaleza de la cuestión que se ventila, por un excesivo celo por lo que se cree justo y muy especialmente por las condiciones de niñez, sexo y por otras de índole análoga; y si como en este caso el juez está bajo la idea de que el verdadero objeto del pleito no es que se esclarezca y determine si la niña Iris es hija legítima o nó del matrimonio Mandes Cruet para que si no lo es no forme parte de una sucesión en la que sólo podía intervenir siendo hija legítima de ese matrimonio sino que el objeto del pleito es sólo privar por ese medio a una niña de una herencia, entonces ese celo por la protección de la herencia de la niña crea un prejuicio en el juez, no venal sino altruista e involuntario pero que no deja de ser prejuicio y que pone al juez en condiciones de no poder apreciar serenamente la prueba para decidir la verdadera cuestión en el litigio, cual es si en verdad la niña es o nó hija legítima de determinadas personas. Y esto es lo sucedido en este caso, pues el juez de la corte inferior en su celo por proteger la herencia de la menor si es hija legítima del matrimonio Mandes estuvo durante todo el juicio bajo la impresión de que este pleito

se establecía no para decidir la cuestión primordial en él sino para arrebatar una herencia a dicha menor, como lo demuestran sus actuaciones en el juicio, que pasamos a exponer, subrayando nosotros algunas de sus palabras.

Isabelino Mandes declaró en el juicio que de su matrimonio con Victoria Cruet y a la muerte de ésta no quedaron hijos; que a Iris la recogieron ellos de siete días de nacida, cuando la madre la estaba ahogando en el río; que la madre de la niña se llamaba Antonia Rivera y murió en el hospital y el padre era Juan Montero y está vivo; que quiere a la niña como si fuera suya; que su esposa recogió a esa niña y él la inscribió de buena fe como hija legítima del matrimonio para completar la caridad que le hicieron porque no tenían hijos; que después de haber inscrito a la niña como hija legítima de su matrimonio consultó con un abogado quien le dijo que debió consultar eso con la corte y que debieron adoptarla pero no inscribirla como hija legítima; que el padre de doña Victoria, supuesto abuelo de la niña, murió dejando hijos y a su esposa; y preguntado cuál es el motivo de alegar ahora que no es hija suya contestó que los herederos del padre de doña Victoria quieren hacer su testamentaría, y se entabló entre el juez y el testigo el siguiente diálogo: "Juez: ¿Por qué Ud. ha esperado hacer eso ahora? ¿Por qué no lo hizo Ud. antes?—Testigo: Debía haberlo hecho antes.—Juez: ¿Ud. es viudo?—Testigo: Sí señor.—Juez: De tal manera que a su señora ¿quién la hereda hoy, tal como están las cosas?— Testigo: Sus familiares.—Juez: ¿Pero hoy, siendo esa niña legítima, quien la heredaría, no sería Iris?—Testigo: Sí señor.—Juez: De tal manera que *hoy lo que se quiere es desheredar a Iris*. Y si Ud. lo hubiese hecho antes su esposa tal vez la hubiera adoptado o la hubiera dado un legado?—Testigo: Debía haberlo hecho antes.—Juez: *Y no lo hizo para reventar a esa chiquita. Ese es el punto* y hoy, muerta la madre, no se puede hacer nada e Iris se quedará en la calle. . . . . Puede irse." Después de esto

el abogado de los demandantes preguntó al testigo si no vive en un pedacito de terreno que era de su esposa y contestó que sí y que se lo van a dar a Iris. Intervino nuevamente el juez a quien dice el testigo que ese terreno son siete y media cuerdas que era lo que tenía el matrimonio, diciendo en seguida el juez: *"Con eso lo que han hecho es reventar a esa chiquita. ¿Ud. dice que la quiere como padre?*—Testigo: Sí señor, la quiero como hija.—Juez: Puede retirarse." Después de haber declarado otros testigos fué llamado nuevamente Isabelino Mandes haciéndosele únicamente las siguientes preguntas: "Juez: ¿Quién es José Cruet Arroyo?— Testigo: El suegro mío: murió.—Juez: ¿Y Ramona Colón, quién es?—Testigo: Mi suegra: está viva.—Juez: ¿Y Julio, Monserrate, Domingo, Marcelina y Carmen Cruet y Colón, son hermanos de su señora?—Testigo: Sí señor.—Juez: *¿De tal manera que lo que discuten aquí es la herencia de su señora para quitársela a esa chiquita?*—Testigo: Sí señor. — Juez: Puede irse." Después el juez en la opinión escrita para declarar sin lugar la demanda dice que éste es un caso especial en que se trata de privar a una niña de doce a quince años de sus derechos de legitimación y con ellos de la parte de herencia de su abuelo y que la niña está entregada en un todo a los enemigos de sus derechos.

Lo que hemos transcrito nos convence de que desde el principio hasta el fin de este pleito el juez ha estado bajo la idea de que el objeto del mismo era solamente privar a la niña de la herencia que pudiera corresponderle en la sucesión de don José Cruet Arroyo, en representación de doña Victoria y no si era cierto que no es hija de esa señora y de su esposo Isabelino Mandes; idea que lo lleva a decir en su dicha opinión que si tuviera ante sí a doña Victoria, a Antonia Rivera, y a Juan Montero quizás variaría de opinión, cuando por la evidencia sabía que eso es imposible porque las dos mujeres habían muerto y porque Juan Montero no estaba obligado a dar contestación tendente a ex-

ponerle a castigo por delito de adulterio. Y ese prejuicio fué causa de que dijera en su opinión que doña Victoria había hecho la legitimación de Iris y repitiera después que fué la que legitimó la niña, cuando lo cierto es que dicha señora no realizó ese acto sino que fué su esposo al inscribir la niña como hija legítima de su matrimonio con doña Victoria, afirmaciones que repite otra vez al decir que a doña Victoria se imputa la falsa· legitimación que se combate; y también fué causa de que apreciara erróneamente la evidencia que a nuestro entender fué suficiente para declarar con lugar la demanda, como se verá por el resumen que de ella haremos.

Además de la declaración de Isabelino Mandes, que hemos consignado antes, se presentaron por los demandantes otros testigos en el juicio celebrado el 24 de abril de 1924. Francisca Vicente testificó que Antonia Rivera vivía en su casa en una habitación que alquiló su querido Juan Montero y allí ellos tuvieron y nació la niña Iris hará unos doce años, habiéndola parteado Antonia Reyes que falleció hace unos tres años; que como a los nueve días de haber nacido esa niña la madre se volvió loca y como su querido estaba en su trabajo el marido de la testigo alquiló al peón Eladio Ortiz y la mandó a casa de Lupe Aponte, tío de ella; que vió nacer a esa niña y como a los ocho días la llevaron a casa de Mandes porque su madre estaba loca. Eladio Ortiz declaró que conoce a la niña Iris que es hija de Antonia Rivera y nació en la casa de Francisca Vicente; que no la vió nacer pero que como a los nueve días lo alquilaron para llevar a Antonia Rivera a la casa de su tío Lupe Aponte a donde la llevó con la hija, la que está en el juicio. Adolfo Poventud manifestó haber conocido a Antonia Rivera y a Juan Montero, que era su vecino, y sabe que la niña Iris llegó a poder de Isabelino Mandes y de su esposa doña Victoria Cruet porque habiéndose vuelto loca Antonia Rivera, madre de la niña, la llevaron a la casa de su tío Guadalupe Aponte y estando el testigo cerca de una que-

brada la madre se tiró con la chiquita en mitad del charco
y entonces el testigo avanzó y le quitó la chiquita a la loca
y después el tío de ella le ofreció la chiquita al testigo pero
no la aceptó porque su esposa había dado a luz guares y
entonces el tío habló con doña Victoria y ella la cogió: que
Juan Montero vivía con Antonia Rivera antes de nacer la
niña como marido y mujer y entonces la vió encinta; la
vió también después del parto; que esa niña es la misma
que cogió doña Victoria; que la niña tiene trece años lo
que le consta porque su señora había dado a luz guares en
la misma fecha y·su hijo tiene trece años de edad y nació
en 1912; que esa niña fué llevada a la casa de Isabelino
Mandes como a los veinte días; que la madre murió loca
en el hospital de Guayama; que vió cuando Guadalupe
Aponte .llevó a la niña a la casa de Mandes para que la re-
cogieran como hija, cuando todavía no había muerto la
madre, y que Juan Montero estaba en la casa cuando nació
la niña pero después se fué para Comerío, era casado y
estaba en las obras del riego de Guayama como mecánico.
Estefanía Poventud no conoció a Antonia Rivera pero la
vió cuando estaba loca y sabe que Iris era muy pequeñita
cuando se la entregaron a los esposos Mandes; que doña
Victoria le dijo ''mira lo que me han traído los reyes'';
que la testigo estaba en la casa y era quien la cuidaba y
los Mandes le decían que no le dijera a la niña que ellos
no eran sus padres; que esa niña no era hija de los Mandes
quienes nunca tuvieron hijos pero la criaron; que a la ma-
dre de la niña la vió en dos ocasiones cuando fué ella a ver
a su hija.   Francisco Aponte, tío de Antonia Rivera, de-
claró que la niña Iris es parienta de él porque es hija de
su sobrina Antonia Rivera y que conoció a Juan Montero
que es el padre de la niña y sabe que ambos vivían juntos
en la finca de Francisca, la señora de Bautista Soto; que
ha hablado con la niña y le ha dicho que son familia por-
que ella se lo preguntó y que le consta que esa niña no es
hija de los Mandes pero la criaron desde que nació.   Ju-

lio Cruet dijo que su hermana Victoria no dejó hijos al morir; que ella no es la madre de Iris; que conoció a los padres de esa niña; que su hermana Victoria dejó una estancia y la idea de la sucesión de don José Cruet es dejar la estancia a la niña porque el que la crió dijo que cuando se arreglara este asunto le pasaran ese terreno a la niña a pesar de no ser su hija y que si Iris fuera hija de Victoria le tocaría como mil pesos en la sucesión de José Cruet Arroyo.

De la prueba documental resulta comprobada también la muerte de José Cruet Arroyo ocurrida el 15 de mayo de 1913; y del testamento de éste que los demandantes son sus herederos. La valoración dada por el Tesorero a los bienes dejados por José Cruet Arroyo asciende a $10,050 y como la mitad son gananciales de la viuda quedará un líquido de $5,025 divisibles entre sus seis hijos, y si Iris es hija legítima de doña Victoria habría que dividir entre siete herederos y correspondería a cada uno $717, si no hay que hacer bajas en la herencia.

Ciertamente que la prueba en casos de la naturaleza del presente debe ser fuerte, robusta y convincente, pero a nuestro entender esos requisitos los reúne la presentada en este juicio pues todos los testigos, entre ellos parientes de la niña, han declarado que no es hija de los esposos Mandes, sin que exista contradicción entre ellos y siendo digna de crédito la de Isabelino Mandes porque la prestó contra su propio interés, pues si Iris es hija legítima de su matrimonio con doña Victoria la niña tendrá derecho, representando a dicha señora, a recibir una parte de la herencia de don José Cruet Arroyo; participación cuyo usufructo durante su menor edad correspondería a Mandes quien también tendría sobre esa participación el derecho de herencia por muerte de la niña antes de que ésta tenga hijos.

Se dice en la opinión de la mayoría de este tribunal que Mandes no explicó por qué no siguió el consejo que le dió

el abogado Sr. Domínguez, pero esa explicación se encuentra en sus propias palabras, pues él declaró que su consulta al abogado la hizo después de haber hecho la inscripción de la niña como hija legítima y que el abogado se limitó a decirle que en vez de esa inscripción debió haberla adoptado como hija, y nada le aconsejó para destruir lo mal hecho. También se dice que debió ser presentado dicho abogado como testigo para corroborar la declaración de Mandes, pero dicho testigo no era permisible por ser su testimonio *res inter alios acta.*

No podemos convenir tampoco con la manifestación de los jueces de la mayoría de este tribunal respecto a que la conducta del juez de distrito en el juicio fué tan sólo una advertencia oportuna a los demandantes de que a ellos incumbía establecer su demanda con prueba robusta y convincente porque nada de eso se deduce de sus palabras sino la expresión de su idea fija de que se quería arrebatar una herencia a la niña; y dichos jueces al confirmar la sentencia apelada llegan hasta suponer, sin base alguna, que la niña puede ser hija de Mandes y de Antonia Rivera, sólo porque no aparece del juicio la fecha del matrimonio de Mandes con doña Victoria ni en la que Antonia Rivera se divorció. Se dice también que Mandes declaró que su esposa y otro hombre impidieron que la niña fuese ahogada y tomó posesión de ella en aquel momento y que el verdadero héroe en aquella ocasión (Adolfo Poventud) no hace mención de que doña Victoria estuviera presente y dijo que más tarde Guadalupe Aponte, tío de Antonia Rivera, le preguntó si quería la niña y que él la· rehusó y le sugirió que la diera a doña Victoria y que entonces fué el tío y habló con doña Victoria, que vió entregar la niña unas tres semanas después y que Antonia Rivera falleció en aquel entonces. Sin embargo nosotros no encontramos esas contradicciones que se trata de señalar. pues lo que dijo Mandes fué que la madre de la niña se tiró por el río abajo y a la gritería se tiró su esposa y otro hombre más y la co-

gieron, y como ella no tenía familia se la llevó a casa y la
crió; lo cual no quiere decir que entonces, en ese mismo
momento, fué que la recogió y que no pudiera haberle sido
entregada días después; ni tampoco el hecho de que Poven-
tud se limitara a hablar de su intervención en ese hecho y
no mencionara a doña Victoria excluye la idea de que di-
cha señora tomara parte en el salvamento de la niña. Y
por último el hecho de que los testigos no resultan unáni-
mes en la fecha exacta del nacimiento de la niña Iris no es
motivo tampoco para declarar sin lugar la demanda por-
que ese particular era un hecho accesorio e inmaterial en
este pleito en el que la verdadera y única cuestión es si ella
es o nó hija de los esposos Mandes; porque la cuestión de
fechas es generalmente cosa frágil en los testigos, como se
demuestra por el mismo testimonio de Adolfo Poventud,
calificado de héroe, quien cuando declaró en el juicio en
1924 dijo que su hijo, contemporáneo con Iris, tenía trece
años de edad y sin embargo manifestó que nació en 1912 lo
que daría una edad de doce años; y porque de todas las
declaraciones se viene en conocimiento que la niña Iris na-
ció en 1913 porque todos declararon respecto a la locura de
Antonia Rivera poco después de su parto, originaria de la
entrega de la niña muy pequeñita y sobre su muerte poco
tiempo después, la que documentalmente consta que fué el
15 de mayo de 1913.

La prueba en este caso nos demuestra que se trata de
uno de los varios casos en que los sentimientos generosos
de un matrimonio sin hijos inscriben como hija legítima
suya a la hija de otras personas con el noble fin de prote-
gerla y de trasmitirle su herencia sin pensar en que la
muerte de alguno de esos padres ficticios pueda perjudicar
los derechos de personas que para nada intervinieron en la
legitimación y que no tienen más disyuntiva que atacarla o
permitir que personas extrañas se introduzcan en su fami-
lia y reciban herencia a la cual no tienen en verdad derecho

y disminuyan así sus participaciones hereditarias; y cuando casos como estos se presentan en los tribunales no debe estarse pensando que las personas que reclaman tienen por único móvil el conseguir unos cientos o miles de pesos más y deben tenerse en cuenta que independientemente de ese hecho la verdadera cuestión es si las personas que inscriben como legítima una niña o niño no son en verdad sus padres. No sería nuevo el caso en que un matrimonio de avanzada edad movido por sentimientos nobles inscribiese como hijo suyo el fruto natural de un hijo del matrimonio que desoye los dictados de su conciencia, y que los verdaderos hijos por afecto entrañable a tal criatura no quieran atacar esa legitimación y permitan que participen en la herencia como si fueran hijos de dicho matrimonio.

Para concluir, réstanos decir que entre los demandantes y los demandados existe nexo jurídico, negado en el voto concurrente, porque si la niña Iris no es hija legítima de los esposos Mandes el figurar como tal produciría perjuicios a los herederos de don José Cruet Arroyo porque disminuiría el haber hereditario de ellos al tener que dar una cuota igual a la suya a dicha niña, y dondequiera que existe un perjuicio tiene que haber un remedio, como declaró este tribunal en el caso de *García v. García*, 18 D.P.R. 964, caso bastante análogo al presente pues en él un niño solicitaba que se anulase la inscripción de su nacimiento hecha en el registro civil como hijo natural de un hombre que no era su padre pero que lo reconoció como tal por afecto a él, y en el que también la corte de distrito estuvo bajo la idea de que no se podía atacar el reconocimiento de dicho menor como hijo del demandado.

En resumen, opinamos que la sentencia apelada debió ser revocada y dictarse otra declarando con lugar la demanda.

Estoy autorizado por el Juez Asociado Sr. Franco Soto para decir que está conforme con este voto disidente.