EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* ANTONIO MEJÍAS VENTURA (*a*) EL CUBANO, acusado y apelante.

No. 5164.—*Sometido:* Junio 26, 1934. *Resuelto:* Julio 24, 1934.

*Samuel R. Quiñones* y *Pelayo Román Benítez,* abogados del apelante; *R. A. Gómez, Fiscal,* abogado de El Pueblo, apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO, emitió la opinión del tribunal.

En febrero 19, 1932, el Fiscal del Distrito Judicial de San Juan formuló acusación contra Antonio Mejías Ventura (a) El Cubano, imputándole la comisión de un delito de asesinato, cometido como sigue: El 3 de febrero de 1932, dicho acusado, en San Juan, con malicia premeditada y deliberado propósito de matar, dió muerte ilegal al ser humano Paul C. Herdering, acometiéndole y agrediéndole con una pistola, infiriéndole una herida de bala a consecuencia de la cual falleció el 5 de febrero de 1932.

Hizo el acusado la alegación de no culpable y en mayo 19, 1932, comenzó a celebrarse el juicio ante un jurado. Terminó el 21, con un veredicto de culpabilidad. Solicitó el acusado nuevo juicio. Su solicitud fué denegada en agosto 22, 1932, y en agosto 27, 1932, la corte dictó su sentencia. Condenó por ella a reclusión perpetua al acusado. Éste apeló contra la resolución denegatoria del nuevo juicio y contra la sentencia. Los puntos envueltos en ambas apelaciones son los mismos. Existe un solo récord.

El primer testigo que presentó el fiscal fué el Dr. Arse-

nio Comas, médico, y cirujano residente del Hospital Municipal de San Juan. Dijo que en febrero 5, 1932, practicó la autopsia del cadáver de Paul C. Herdering que presentaba una herida superficial en la muñeca derecha con entrada y salida y otra en la región hipogástrica que interesó el intestino ciego, muriendo Herdering de una peritonitis y septicemia grave producidas por la herida de bala. Extrajo ésta que encontró alojada en el hueso ilíaco, cara interna, y la entregó a la Administradora del Hospital señora Carreras.

A repreguntas de la defensa explicó que el herido llegó al hospital en la noche del tres. Esa misma noche se enteró de su nombre por el "chart" que prepara la enfermera. Pidió la defensa que se eliminara la declaración del testigo y éste manifestó: "No me entendió el Licenciado. La noche de la operación yo supe que era Paul C. Herdering. Después lo seguí asistiendo dos días, hasta que murió." Insistió la defensa y la corte declaró sin lugar su solicitud.

La administradora del hospital fué el séptimo de los testigos de cargo. Se llama Josefa Moreno de Carreras. Dijo que al llegar al hospital la mañana del 4 de febrero, recibió una nota del Doctor Comas con $51 y las ropas de un señor Paul C. Herdering para que lo guardara todo en la caja del hospital. Como a las ocho y cuarto llegó el doctor del vapor "Nillus" y le recomendó que atendiera bien "a Herdering", que ellos tenían que partir. Subió a la habitación y encontró al herido hablando con el Capitán. Le preguntó qué le pasaba y le contestó que estaba muriéndose.

Continuó la testigo manifestando que se interesó mucho en el caso y trató de que el herido le refiriera lo que le había pasado. Se opuso la defensa. Surgieron varios incidentes y finalmente ocurrió lo que sigue:

"Yo insistí en que él me contara . . . y él entonces me dijo: 'Alright', y yo cogí una libreta y apunté. Entonces me dijo: 'Le voy a contar', y empezó el relato en la siguiente forma: A las siete (7) salí del vapor . . . .

"Def.—Un momento. Yo lamento interrumpirla. Nosotros, señor Juez, levantamos la misma cuestión.

"Juez.—Vamos a ver cuáles fueron las verdaderas palabras del individuo anteriores a ésas.

"F.—Antes de hacer la manifestación esa, ¿cómo se sentía él?

"T.—Se sentía muy mal. Decía: 'Me estoy muriendo. Yo quisiera vengarme de este hombre que me ha matado . . .' 'Yo odio a los puertorriqueños . . .' creído que había sido un puertorriqueño. 'Me muero, me muero . . . Yo quisiera tener una botella de *whiskey* para olvidar . . .' Y entonces yo noté que el hombre estaba grave y cogí un lápiz y un papel y le dije: 'Usted tiene familiares, déme la nota', y entonces me dijo que su mamá se llamaba Annie Herdering y que vivía en Pedborn, Germany, y yo cogí la nota. Si se me permite yo contaría toda la historia de lo que pasó.

"Defensa:—Se murió cuánto tiempo después?

"T.—Esa misma tarde a las 5:00.

"Juez.—Me parece que de acuerdo con la jurisprudencia en el caso de *El Pueblo* v. *Díaz*, 35 D.P.R. 852, se han establecido las bases suficientes para la declaración de la testigo, y la Corte permite que declare sobre las manifestaciones del interfecto.

"Def.—Con nuestra excepción.

"F.—Continúe, señora.

"T.—Entonces yo le decía: 'No se apure; usted se sentirá bien' y decía: 'Me hace falta aire; el aire del mar', y entonces yo le decía: 'No piense en el mar. Cuénteme', y el hombre empezó su relato en la siguiente forma:

" 'Salí del vapor a las 7:00, fui al cine y después fui a la Porto Rico Drug a tomar un refresco. Allí me encontré con dos compañeros del barco. Con esos dos compañeros decidimos ir a Puerta de Tierra a tomar una cerveza. Después de tomar la cerveza en Puerta de Tierra decidimos irnos al vapor porque el permiso era hasta las 10½. Al bajar por la estación, frente a una callejuela, yo iba hacia adelante y mis dos compañeros detrás. Allí noté que un hombre, acompañado de otro más trigueño, me atacó. No pude reconocerlo. Sólo sé que al levantar mi mano sentí el disparo y caí y al caer el hombre corrió por un callejón que hay al frente y el otro no me dí cuenta de lo que hizo. Entonces yo llamé a Hans, que era uno de los compañeros, y le dije: "Hans, sálvame", y Hans salió corriendo con el otro. Vino el policía y me trajo al Hospital.' "

Reconoció, por último, la testigo el plomo de una bala

que le presentara como parecido al que le entregó el Dr. Comas que a su vez entregó a la detective.

La persona que condujo al herido al hospital fué el policía Evaristo Labastide, el sexto testigo que declaró. Dijo que estaba de servicio frente al muelle No. 5 y oyó un disparo. Se dirigió al sitio y encontró dos hombres que corrían, dos extranjeros que le dijeron que habían herido a su compañero en la esquina. Siguió y encontró a un hombre de nombre Paul C. Herdering tendido en el suelo. Llamó la ambulancia y en ella lo llevó al hospital. Era después de las once de la noche.

La segunda declaración que aportó el fiscal fué la de Natividad Espada, que imputa directamente la comisión del acto delictivo al acusado. Es de color, como de veinte y un años, vecino de Puerta de Tierra. Conocía al acusado, y en la noche del tres de febrero, 1932, salió a pasear con él desde Puerta de Tierra hacia San Juan, donde estuvieron como hasta las diez y media en que caminaron hacia Puerta de Tierra, llegando hasta la Plaza de los Leones. "A los pocos instantes," dice textualmente, "se apareció un grupo de hombres, de en casa de la señora Carmen Capre, y noté que él me dijo: 'Vámonos'. Partimos por la misma carretera que da a la estación del ferrocarril; de la estación del ferrocarril bajamos a la Colectiva, y allí, en la orilla de la puerta, se sentó y yo estaba de pie. Como a los veinte minutos se personaron los tres hombres; uno alante y dos detrás. Al embocar el que venía al frente en la bocacalle, él se levantó y se metió la mano por el lado derecho, sacando la pistola y diciéndole unas palabras en inglés, cuyas palabras no le oí. El hombre quedó manos arriba. Al quedar manos arriba, demostró valentía: quiso bajar las manos, y al querer bajar las manos, disparó. F.—¿Quién disparó? T.—El Cubano. F.—¿Contra quién? T.—Contra el hombre."

Muestra el récord que surgió entonces este incidente:

"Mientras pasivamente declaraba el testigo de cargo Natividad Espada, el acusado, Antonio Mejías Ventura, se levantó violentamente de su asiento, diciendo 'Eso es mentira, canalla, sinvergüenza, hijo de puta, no puedo permitir que cara a cara mientas tan descaradamente', y tomando de sobre la mesa del señor Fiscal un tomo de las Decisiones de Puerto Rico, lo lanzó violentamente contra el testigo llegando a agredirle en la mano derecha, y al intentar avanzar hacia él, en actitud agresiva, fué agarrado por el Márshal de esta Corte, señor Daniel Sosa, con quien sostuvo fuerte lucha, siendo entonces este funcionario de la Corte auxiliado por los Detectives Santiago, Alvarado, Henna y el Jefe Monteserín, siendo así reducido a la obediencia.

"La Corte entiende, en primer lugar, que hay causa suficiente para instituir un procedimiento de desacato, lo que considerará más tarde, y mientras tanto, en vista de la conducta desordenada del acusado en corte abierta, y puesto que el juicio debe continuar y para mantener el orden en el Tribunal, se ordena que se le pongan esposas al acusado.

"Def.—Solicito de la Corte, lamentando el incidente, que no se le pongan esposas al acusado y que se reconsidere la orden.

"Juez.—La corte deniega la solicitud."

Continuó declarando el testigo que después de disparar, "El Cubano" arrancó a correr. Reconoce el traje y el sombrero que se le muestran como los que llevaba esa noche el acusado. También la pistola que había visto antes en el cuarto del acusado.

La defensa sometió al testigo a un contrainterrogatorio que ocupa unas cuarenta páginas del récord. El testigo no sólo sostuvo lo que había dicho anteriormente si que en ciertos extremos lo reafirmó y aclaró. Por ejemplo, dijo que cuando se encontraban en la Plaza de los Leones, "al estar parados allí él (el acusado) me dijo que allí en frente, en la casa de Carmen Capre, entraban americanos y que cuando entraban ahí salían borrachos, y de la manera que se podían coger era borrachos".

La declaración del siguiente testigo, Eugenio Ayala, carece de importancia. Sí la tiene la de María Torres Ríos, una pobre ramera que fué llamada a declarar tras él. Dijo

que residía en Puerta de Tierra en una habitación de la misma casa en que vivía el acusado; que había venido a San Juan a coger fresco en la noche del tres de febrero de 1932, regresando como a las once. "Cogí por la estación del tren y en un sitio obscuro ví que corría un hombre. A mí me dió miedo y corrí también detrás, y cuando llegué a la luz conocí que era el Cubano. . . . "

Antolino de Jesús es el marido de Carmen Capre, dueña al parecer de una casa de lenocinio que está cerca de la Plaza de los Leones. Dijo que estaba vigilando la casa la noche del crimen porque temía que fuera a ser denunciada. Carmen Capre le llamó la atención hacia dos hombres que estaban en la plaza mirando con insistencia hacia la casa y se fué a reconocerlos y como no eran los que temía no se preocupó. Identificó al acusado y al testigo Espada como los dos hombres que vió. Serían las diez de la noche.

Carlos Alvarado fué el detective encargado de la investigación del crimen. Clara Angleró que fué querida del acusado en un viaje anterior que éste hizo a Puerto Rico y a cuya casa se dirigió cuando llegó últimamente no pudiendo permanecer en ella porque Clara tenía otro hombre, fué la primera que les habló de la pistola del acusado, dándoles luz al referirse a otros " 'hands-up' que él había dado." Sospecharon. El acusado era un extranjero que no trabajaba, que tenía mujeres y adornadas sus habitaciones. Decidieron registrar éstas y obtuvieron una orden judicial de allanamiento. Fueron y sólo pudieron ocupar la ropa. Fué luego que ocuparon la pistola que les entregó doña Rosa.

Esta testigo es la dueña de la casa en que se alojaba el testigo Espada, que está cerca de la del acusado. Dijo que Elisa Malavé, que vivía con el acusado, se le presentó diciéndole:

" 'Al Cubano me le llevaron la maleta, los zapatos y la ropa de la percha. . .' Yo permanecí callada. Después rápidamente sale corriendo y me pone un paquete en las manos para que se lo guardara.

"F.—¿Cómo era ese paquete?

"T.—Un paquete que venía envuelto en un traje de ella y en un periódico.

    \*       \*       \*       \*       \*       \*       \*

"T.—Cuando llegué a mi casa me fijé y ví que era una pistola. Luego entonces determiné guardarla."

Elisa Malavé que vivía en efecto con el acusado cuya ocupación era "Dedicarse a jugar a veces" y a quien cuando no tenía ayudaba con lo que le daban los amigos que recibía en su casa, declaró:

"Después que la detective se fué yo fuí a casa de la señora Rosa del Valle y le dije que habían cogido al Cubano preso pero que yo no sabía quién lo había cogido, si había sido la inmigración. Yo fuí llorando porque yo padezco de los nervios y me asusté al ver toda la detective en mi casa. Entonces me dice ella: 'Vamos allá para ver cómo fué eso', y salió Natividad y la señora conmigo, a casa. Entonces, cuando veníamos por el camino, me dice ella: '¿Y la pistola?' y le digo: 'Pues guardada allí está', y me dice: 'Pues dámela para guardársela'.

"F.—¿Dónde estaba esa pistola?

"T.—Estaba debajo de la casa, guardada.

"F.—¿Debajo de la casa?

"T.—De la casa mía.

    \*       \*       \*       \*       \*       \*       \*

"F.—¿Quién le dijo a usted que esa pistola estaba allí debajo de la casa?

"T.—A mí no me lo dijo nadie. Solamente el día antes él me dijo 'No eches agua por ahí'. Luego después él se fué y yo, averiguando, encontré la pistola.

"F.—Aquel día por la mañana, cuando él se levantó, ¿no le dijo a usted que esa pistola estaba debajo de la casa?

"T.—Por la mañana no me lo dijo; él me dijo el día antes de cogerlo preso: 'No eches agua por ahí', y yo, averiguando, encontré la pistola.

    \*       \*       \*       \*       \*       \*       \*

"F.—Cuando la detective registró, ¿usted le dijo que aquella pistola estaba allí?

"T.—No, señor, yo no le dije nada a la detective.

"F.—¿Y usted sabía que la pistola estaba allí?

"T.—Sí, señor, pero no se lo dije a la detective.

"F.—¿Usted vivía con el acusado?

"T.—Sí, señor.

"F.—¿Y le daba dinero a él?

"T.—Cuando tenía. Cuando él no tenía yo lo ayudaba, porque cuando él tuvo, que trabajó, él me ayudó a mí."

Clara Angleró, la primera mujer del acusado, declaró que éste vino últimamente a Puerto Rico en 1931 y fué a su casa, "traía en las maletas una placa, y en el costado de aquí, al otro lado, traía una pistola" que es parecida a la ocupada que se le muestra. "Yo le dije que no podía quedarse y se fué."

Repreguntada por la defensa contestó que en 1929 el acusado era su marido y le dió una paliza y se fué; que volvió otra vez y "me dió de abuso, yendo yo a coger la guagua, me dió, y yo lo denuncié. Estaba el Boliviano, que es testigo de él. Había muchísimas personas, pero nadie quiso servir de testigo."

Repreguntada:

"A.—¿Usted no amenazó al Cubano entonces?

"T.—Yo no lo amenacé sino que fuí y llamé al Policía Dávila y le dije lo que había pasado, y le hablé del asunto del alemán.

"A.—No, vamos a dejar el alemán.

"T.—Por eso fué el disgusto, por la cuestión del alemán."

Cuando la defensa terminó, volvió el fiscal a interrogar a la testigo así:

"¿Por qué fué ese disgusto con el acusado?

"T.—Porque él me amenazó con la pistola una noche antes, que estaba el alemán en casa. Resulta que fuí a cambiarle un billete . . .

"F.—¿A quién le fué a cambiar un billete?

"T.—Al alemán."

El alemán a que la testigo se refiere era distinto del que fué agredido mortalmente en la noche del tres de febrero de 1932.

Por último, reconoció el Jefe de la Detective, Monteserín, el plomo de la bala que el doctor Comas extrajo del cadáver del infortunado Herdering y que le fué entregado por su su-

bordinado Alvarado a quien a su vez lo entregó la Directora del Hospital Municipal, y el plomo, la pistola, la ropa y el sombrero ocupados en la casa en que vivía el acusado como suyos, se introdujeron en evidencia por el fiscal y se admitieron por la corte con la oposición del acusado.

La prueba de descargo consistió en las declaraciones de Rafael Martínez Nadal, Manuel Iglesias y Antonio Quirós Méndez.

Declaró el primero que a su bufete fué Natividad Espada a pedirle un consejo. ''Me dijo: 'Yo necesito su consejo como hombre de experiencia.' ¿Y qué le pasa? 'Qué yo he declarado contra ese hombre porque la policía, por haber estado yo con él tres o cuatro días antes, me arrestó por sospechas.' Y me dice entonces: 'Y me han obligado a declarar cosas que yo no he visto y que yo no he presenciado.' Entonces yo le dije: 'Si usted vió lo que usted declaró y si eso es cierto, usted debe repetir su declaración porque un ciudadano bueno no debe permitir que se escape un asesino, y mucho menos un asesino de esta naturaleza, que por robar da un atraco de noche y mata a un hombre.' 'Es que eso no es cierto,' me dijo. 'Yo no he visto eso. ¿Qué riesgo tendría yo si rectifico mi declaración?' Dígole: 'Pues de uno a diez años de presidio por perjurio. ¿Eso que usted dice que declaró no es cierto?' Dice: 'No.' Y dígole: 'Pues ésa es otra infamia. Si usted no habiendo visto nada sostiene eso contra un hombre que por su declaración puede ir a presidio por toda la vida, es una infamia. Y los hombres buenos no empiezan la vida así.' Entonces el hombre se quedó callado un rato, como que se le aguaron los ojos, y dijo: 'Pues iré a presidio.' ''

Iglesias manifestó haber visto al acusado en la noche del tres de febrero de 1932 más o menos a las once, en la calle Pelayo de Puerta de Tierra. El testigo es suramericano, trabajaba en un barco y se quedó en tierra por un disgusto que tuvo con el maquinista.

Quirós Méndez es abogado en ejercicio. Se le encomendó

primeramente la defensa del acusado y en su bufete estuvieron Elisa Malavé y María Torres a pedirle que le tomara declaración a Natividad Espada, testigo del Pueblo. Les manifestó que no podía hacerlo personalmente, que volvieran al día siguiente en que tendría preparado un notario. Volvieron pero no se consiguió el notario, quedando citados para el próximo día en que no comparecieron y nada más se hizo.

Tal fué, en resumen, la prueba que sometida al Jurado con las debidas instrucciones de la corte, sirvió de base al veredicto condenatorio, base a su vez de la·sentencia recurrida.

En su alegato señala el apelante la comisión de diez y seis errores. Los dos primeros versan sobre la identidad de la persona fallecida; los números 3, 5, 6 y 7 giran alrededor de la declaración de la Directora del Hospital; el número 4, sobre el incidente de las esposas; el 8, sobre repreguntas a la testigo Angleró; los 9, 10 y 11 sobre la admisión en evidencia del plomo, la pistola y las prendas de vestir; el 12, sobre la admisión de declaraciones de testigos que no figuraban en la acusación; los 13, 14 y 15 se señalan como cometidos por la corte al no instruir al Jurado que Espada era un cómplice, al no recomendarle que absolviera al acusado y al instruirlo desacreditando la defensa de coartada por el acusado presentada. El último error se señala como cometido por la corte al declarar sin lugar la moción de nuevo juicio.

Resumimos primero la evidencia y los incidentes del juicio tanto para conocer el caso en sus méritos cuanto para que fuera más comprensible y más rápida la discusión de los errores.

■ Veinte páginas de su alegato dedica el apelante a discutir la cuestión de si se demostró o no debidamente en el juicio que la persona realmente muerta a consecuencia de la herida era la nombrada en la acusación, Paul C. Hendering.

A nuestro juicio la prueba es clara sobre el particular. El herido fué recogido momentos después de la agresión

por un policía que se comunicó antes con sus dos compañeros. Era un joven marino extranjero que fué asaltado cuando regresaba con sus camaradas a su barco después de algunas horas de expansión por la ciudad. El propio policía dijo que su nombre era Paul C. Herdering. La defensa no objetó, ni siquiera inquirió la razón de su dicho.

Al llegar al hospital se le registró como Paul C. Herdering y como tal lo asistió el cirujano de la institución. Al día siguiente fueron a visitarlo y a dejar instrucciones el capitán y el médico de su barco, y el médico recomendó a Herdering al cuidado de la Directora. Se le atendió en verdad, pero sin éxito. La herida era fatal; la muerte, su consecuencia necesaria, y fué el cadáver de Paul C. Herdering en el que practicó la autopsia el Doctor Comas y del que extrajo el plomo homicida.

██ Argumentando los errores 3, 5, 6 y 7 hace también un extraordinario esfuerzo la defensa, citando gran número de casos en relación con declaraciones en artículo de muerte.

Sostiene que las manifestaciones atribuídas en este caso al herido no fueron voluntarias, estando el herido reacio y siendo la Sra. Moreno la que lo obligó a declarar; que no fueron hechos con un sentido claro del peligro inminente de la muerte, ni en un momento solemne; que el herido hablaba en inglés y no se demostró que la persona que las recogió conociera dicho idioma; que el herido revelaba odio y ánimo de venganza; que ya existía otra prueba de lo que se pretendía demostrar con las manifestaciones, la declaración de Espada; que las manifestaciones con respecto a la persona que le agredió constituían además una conclusión; que si fueron tomadas por escrito, el escrito debió presentarse como constitutivo de la mejor evidencia, y que no se le dió oportunidad de continuar en sus repreguntas antes de que la corte resolviera que la declaración era admisible.

Omitiremos la cita de jurisprudencia. Es bien conocida. Se trata de una excepción. La declaración del moribundo sólo puede ser admitida a través de la persona que la escu-

chaba cuando realmente se demuestra que el declarante se da cuenta de su estado, hablando en momento tan solemne como si estuviera listo para responder de sus actos ante Dios.

No hemos transcrito todos los incidentes que surgieron. Transcribimos lo que consideramos más esencial. En su conducta la Sra. Carreras no revela quizá aquella gravedad y peso que la hubiera presentado como un testigo perfecto, pero su aparente frivolidad y su interés en conocer lo que había ocurrido más bien por curiosidad novelesca que inspirada en el cumplimiento de un deber, no son suficientes para desacreditar su testimonio. Se manifestó tal cual era y el Jurado tuvo oportunidad de enfrentarse con la realidad de la vida y no con algo fabricado o fingido.

Que Herdering se daba cuenta de su estado, surge tan claro de los autos que cada palabra suya recogida en ellos revela la certidumbre de la muerte irremediable. Aun es así en los momentos en que parece concebir una remota esperanza. Y en cuanto a su llamado espíritu de venganza, al odio que sus palabras externaban, signos eran de su desesperación ante el hecho insólito de que fué víctima. Tierra obscura, inhospitalaria y criminal tenía que ser para él, como lo fué por desgracia, esta muestra en que de modo tan vil fué asesinado.

En momentos de elevación espiritual, en raptos de grandeza casi divina, el hombre no sólo puede llegar a perdonar si que a amar a su enemigo y a orar por los que lo ultrajan y persiguen, pero eso no es lo normal, es lo excepcional supremo.

Lo natural es que los hechos se produzcan como en el caso de Herdering. Si el espíritu de odio o venganza que revelan sus palabras llevara por lo menos la duda de que podía dañar intencionalmente a determinada persona, tal espíritu haría que sus manifestaciones fueran inadmisibles. Pero aquí no se advierte tal cosa. Sus palabras son el signo de su dolor, de su indignación, de su desesperación ante la crueldad y la injusticia de lo hecho con él arrebatando su vida en forma

tal, sin motivo, sin defensa; pero en manera alguna obscurecen el sentido de la verdad de cuanto dijo.

Dejando que los hechos hablen por sí mismos, creemos que no se cometió error alguno al admitir la evidencia, especialmente cuando la corte después de explicar al Jurado en sus instrucciones los hechos y la ley sobre la materia, terminó diciéndole:

"Si el Jurado queda satisfecho, por la apreciación de la prueba, que el declarante, o sea en este caso Paul C. Herdering, se hallaba en peligro inminente de muerte y que él conocía ese estado, puede entonces considerar la declaración del moribundo, o sea, de Paul C. Herdering, y es de la incumbencia del jurado apreciar, como cualquiera otra prueba, si tal declaración fué en realidad prestada y si ella es o no cierta."

Todos los otros motivos de error señalados en relación con la declaración de que hemos venido ocupándonos, han sido estudiados y a nuestro juicio no existen.

Carecen también de importancia y no requieren argumentación escrita en contrario, los señalamientos 8 al 12. Nos detendremos sólo algo más en la cuestión de si el testigo Espada es o no un cómplice, en el incidente de las esposas y en la prueba de descargo.

A virtud de las declaraciones hasta ahora analizadas sólo podríamos llegar a la conclusión de que en la noche del tres de febrero de 1932 se perpetró el asesinato en la persona de Paul C. Herdering imputado en la acusación a Antonio Mejías Ventura, pero no que éste lo perpetrara. Es a base de la declaración de Espada que el acusado queda directamente conectado con el crimen de que se le acusa.

Conocemos su testimonio. Es terminante. Creído, basta por sí solo para sostener el veredicto y la sentencia. Y el Jurado lo creyó, no obstante las sombras que arrojó sobre él la declaración de Martínez Nadal. Parece conveniente decir en este instante que Espada negó que hiciera esas manifestaciones.

Si se admite que dijo por entero la verdad, Espada no

es un cómplice. Dudamos mucho, sin embargo, de que Espada no estuviera en antecedentes de que algo malo se tramaba, aunque creemos que jamás pensó que pudiera alcanzar las proporciones que alcanzó. Pero aceptando que a virtud de las repreguntas y de la natural explicación que surge de los hechos mismos, Espada pudiera ser considerado como un cómplice, siempre quedaría en pie su testimonio porque fué corroborado ampliamente por el resto de la prueba.

Aparte de lo dicho por su víctima en artículo de muerte, Apolonio de Jesús vió al acusado con Espada en actitud de observación en la Plaza de los Leones, María Torres lo vió correr por la vía momentos después del crimen, cerca del sitio en que fué cometido, y su pistola se encontró por su querida en el sitio debajo de la casa en que la escondiera.

De todos esos testimonios dejamos transcrito algo que habla por sí mismo con extraordinaria fuerza, y que debió ser más elocuente aún para el Jurado que pudo observar a través de sus rostros y ademanes el alma de los testigos.

Bajo esas circunstancias no podemos considerar como erróneas las siguientes instrucciones de la corte:

"La evidencia ha tendido a demostrar que Natividad Espada acompañaba al acusado Antonio Mejías Ventura, lo que pudiera hacer de él un cómplice, según el Jurado considere su intervención.

"Un cómplice, según nuestro Código Penal, es aquél que coopera o ayuda en la comisión de un crimen.

"De acuerdo con la ley común, las declaraciones de los cómplices son bastantes para sostener una sentencia condenatoria aunque no hubieren sido corroboradas, si bien su credibilidad debe ser considerada por el Jurado teniendo en cuenta que no son del más satisfactorio carácter. Por esto algunas legislaciones, como la nuestra, han preferido declarar que una persona no puede ser convicta por la declaración de un cómplice a menos que esté corroborada. La regla general admitida para comprobar si un testigo es cómplice o no, es la de si podría ser acusado por el mismo delito que se investiga, pues si no puede serlo, entonces no puede ser considerado como tal, y la participación del cómplice debe ser en el mismo delito que se persigue, sin que sea bastante que la tenga en otros delitos similares.

"Un cómplice de un crimen es el que, como dije antes, coopera

o ayuda en su comisión. La declaración de un cómplice queda corroborada cuando, eliminada la evidencia del cómplice, existe prueba tendiente a conectar al acusado con el delito. Se sugiere esta forma como una prueba adecuada: eliminad del caso la evidencia del cómplice y entonces examinad la evidencia del testigo u otros testigos en el caso con objeto de determinar si hay prueba inculpatoria, prueba tendiente a conectar al acusado con el delito que se le imputa. Si existe, el cómplice está corroborado. Si no existe ninguna prueba inculpatoria, no hay corroboración aunque el cómplice pueda ser corroborado en cuanto a cualquier otro número de hechos por él declarados.

"El mero silencio de un hombre, quien no ayuda o induce, y que no intenta ayudar al reo, no hace de él un cómplice. Tampoco el de estar enterado de que iba a cometerse un delito y no dar cuenta de ello."

El incidente de las esposas no puede servir de base para la revocación de la sentencia. La corte actuó correctamente. Además, no consta que finalmente se tomara excepción. No aparece que el acusado continuara con esposas durante las otras sesiones. Si pudo perjudicar al acusado, culpa suya fué. El perjuicio tendría su origen no en las esposas, sino en la conducta misma del acusado.

La prueba de descargo fué apreciada por el Jurado al par que la de cargo. Predominó ésta en su conciencia y el acusado fué declarado culpable. No hubo error.

Hemos examinado las instrucciones de la corte con respecto a la defensa de coartada y no creemos que tendieran a desacreditar la presentada por el acusado. El haber dicho la corte que: "La coartada es una de las defensas más fáciles de manufacturar y más difíciles de controvertir y debe considerarse con cuidado y cautela," no constituye error, especialmente cuando la corte advirtió al Jurado inmediatamente que ello no quería decir que la presentada en este caso hubiera sido manufacturada y de una manera imparcial y amplia entró en el análisis de la misma.

No habiéndose cometido, pues, ninguno de los errores señalados, surgiendo claramente de los autos la culpabilidad

del acusado y ajustándose a la ley la acusación, el veredicto y la sentencia, *deben declararse sin lugar ambos recursos, quedando confirmada la sentencia recurrida.*