EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* JUAN PIERANTONI, acusado y apelante.

Núm. 8918.—*Sometido:* Febrero 10, 1942. *Resuelto:* Febrero 25, 1942.

14

*R. Hernández Matos*, abogado del apelante; *Hon. Procurador General George A. Malcolm, R. A. Gómez, Fiscal del Tribunal Supremo* y *Luis Negrón Fernández, Fiscal Auxiliar*, abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR TRAVIESO emitió la opinión del tribunal.

El apelante fué acusado de asesinato y convicto de homicidio voluntario por haber dado muerte a Antonio Albino, Jr. Solicitó nuevo juicio, le fué denegado y la corte le condenó a tres años de presidio por el delito de homicidio y a un mes de cárcel por el de portar armas.

El presente recurso se basa en dos señalamientos de error. En el primero se alega que la corte sentenciadora erró al negarse a conceder un nuevo juicio, y en el segundo, que cometió error grave y perjudicial al condenar al acusado por el delito de portar un arma. En apoyo del primer señalamiento, el apelante aduce los mismos diecinueve fundamentos en que basó su moción de nuevo juicio. Los discutiremos y resolveremos en el mismo orden en que aparecen expuestos en el alegato.

Que la corte erró al permitir que el fiscal, al exponer su teoría del caso, hiciera referencia a otros delitos y actos que no se le habían imputado al acusado y que fueron realizados por otros personas, sin que en la acusación se imputara al acusado haber actuado de acuerdo con dichas personas.

Las manifestaciones del fiscal, tal y como aparecen del récord, fueron las siguientes:

"Los hechos se desarrollaron de la manera siguiente: la familia Albino vivía en uno de los campos de Peñuelas...hacía siete u ocho años. El padre de Antonio Albino, Jr., o sea Antonio Albino, Senior, era mayordomo de esa finca.... *Este acusado, y los hermanos de este acusado, que también están acusados por otras muertes ocurridas* en

el mismo momento, en el mismo sitio donde este acusado dió muerte a Antonio Albino, Jr., yendo este acusado acompañado por otros hermanos de él, llamados Vicente, Miguel y Teodoro Pierantoni, estos hermanos, o esta familia, que reclamaba tener derecho a la posesión de esa finca y de esa casa, el 9 de marzo de 1938 se convirtieron en jueces, en marshals y en policías, para tomar de cualquier manera, a sangre y fuego, posesión de esa casa y de esa finca, y llegaron a la misma.'' (Itálicas nuestras.)

El fiscal continuó relatando cómo los hermanos Pierantoni exigieron a Albino padre que desocupara la casa, porque si no lo hacía lo iban a matar; que Albino trató de persuadirlos para que esperasen hasta que llegara el dueño de la finca; que Vicente Pierantoni le contestó sacando el revólver y disparándole un tiro; que entonces el acusado lo remató en su propia sala; y que cuando los hijos de Albino corrieron aterrorizados, el acusado les disparó alcanzando a Antonio Albino, Jr., quien murió poco después a consecuencia de las heridas recibidas.

La objeción de la defensa fué formulada al terminar el fiscal de pronunciar las palabras que aparecen en itálicas en el párrafo arriba transcrito. La corte desestimó la objeción. Del récord no aparece que la defensa tomara excepción. Y el fiscal continuó exponiendo su teoría, en la forma que ya hemos visto, sin oposición alguna por parte de la defensa.

La exposición de sus respectivas teorías por el fiscal y por la defensa, se hace con el fin de preparar al jurado para que pueda entender e interpretar debidamente la evidencia que le ha de ser sometida en apoyo de una y otra teorías. Al exponer la suya, tanto el fiscal como la defensa pueden hacer referencia a cualquier hecho que de acuerdo con las reglas de evidencia pueda y deba ser considerado como parte del *res gestæ,* o a cualquier hecho o circunstancia que sea inseparable del hecho o acto criminal que se imputa al acusado. La cuestión no es nueva en esta jurisdicción. En *Pueblo* v. *Souffront,* 30 D.P.R. 105, *Pueblo* v. *Philip,* 34 D.P.R. 644 y *Pueblo* v. *Sierra,* 42 D.P.R. 504 esta Corte Suprema ha sostenido que si varios delitos están relaciona-

dos o unidos entre sí, o enlazados de tal modo que forman una transacción criminal indivisible, y no puede presentarse completa prueba testifical de cualquiera de ellos sin mostrar los otros, la evidencia de uno o todos ellos es admisible contra un acusado en un juicio por cualquier delito que es en sí una parte de toda la transacción criminal. Véase Underhill *On Criminal Evidence,* cuarta edición, página 1107, sección 561.

No erró la corte inferior al permitir que el fiscal expusiera su teoría en la forma en que lo hizo.

▉ Que la corte tomó de su cuenta el interrogatorio de varios testigos de El Pueblo.

El apelante llama nuestra atención hacia las páginas 103, 170 y 275 de la transcripción de evidencia. Hemos leído el contenido de la página 103 y encontramos que toda ella se refiere al convenio celebrado entre las partes para someter los dos casos, el de asesinato y el de portar armas, con la misma prueba. En la página 170 encontramos solamente una discusión entre la corte y la defensa con respecto a si podía o no discutirse dentro de una causa criminal la cuestión sobre el título de la finca en donde se cometió el crimen.

El incidente a que se hace referencia en la página 275 ocurrió así: la defensa ofreció en evidencia el testimonio del policía insular Erasmo Gotay, quien declaró con respecto a la investigación practicada por él en la finca después de haberse cometido el crimen. Al tratar de declarar el testigo sobre las manifestaciones que le hiciera la viuda de Antonio Albino, se opuso el fiscal alegando que dichas manifestaciones no eran admisibles como parte del res gestæ, ni tampoco lo eran para impugnar la declaración de la testigo, pues la defensa no había sentado las bases para tal impugnación. Fué entonces que el juez, para poder determinar si las manifestaciones eran o no admisibles como parte del res gestæ, hizo al testigo las siguientes preguntas:

"P. ¿Ud. presenció los hechos que se desarrollaron allí en el momento que sucedió el caso, lo que pasó allí?

"C.   No, señor.

"P.   ¿A qué hora llegó al barrio, dice?

"C.   A las 9:10 de la noche.

"P.   ¿Cuándo Ud. llegó allí no había ninguna pelea, ni ninguna garata ni altercado?

"C.   Cuando llegué estaba el cadáver de Antonio Albino tendido en el piso de la casa arriba y estaba la familia allí.

"P.   ¿Pero no había ningna contienda, nadie disparaba tiros, nadie garateaba?

"C.   No."

Terminado dicho interrogatorio, la corte sostuvo la objeción del fiscal.

A nuestro juicio, la corte inferior procedió correctamente e hizo buen uso de su discreción al hacer las preguntas que hemos transcrito, las cuales eran absolutamente necesarias para que el juez pudiese resolver debidamente la cuestión planteada por la objeción del fiscal.   Véase *Pueblo* v. *Munera,* 39 D.P.R. 295.

■ Que la corte inferior erró al excluir la evidencia tendiente a demostrar el título que tenía el acusado sobre la finca en que se desarrollaron los hechos.

Al repreguntar al testigo Pedro Albino, hermano del interfecto, quien declaró cómo había ocurrido la muerte de su padre y de su hermano, el abogado defensor le hizo el siguiente interrogatorio:

"P.   ¿Ud. declaró que su papá don Antonio Albino era mayordomo de esa finca?

"C.   Sí, señor.

"P.   ¿De quién era esa finca para esa época?

"C.   Mientras mi papá estuvo ahí, era....Nosotros aún reconocemos que era de Juan Bautista Galarza.

"P.   ¿Como dueño de la finca?

"R.   Como dueño de la finca, y mi papá vivía en ella nueve años.

"P.   ¿Ud. sabe si esa finca era de la Sucesión Pierantoni?"

Se opuso el fiscal, alegando que no se podía discutir la cuestión de título.   Alegó la defensa que iba a probar que la

finca no era de Galarza y que por el contrario era de la Sucesión Pierantoni. Sostuvo la corte la objeción del fiscal, diciendo:

"Pero aunque sea de Sucesión Pierantoni, ellos no tenían derecho de ir a ocupar la finca sin una orden de la corte. Fuera quien fuera no se puede ir a una finca a sacar a las personas por la fuerza."

Del récord no aparece que la defensa tomara excepción a la resolución de la corte y eso bastaría para que desestimáramos este señalamiento. Empero, opinamos que la corte inferior no erró al excluir la evidencia tendiente a probar que el acusado y sus familiares tenían algún título sobre la finca. La evidencia estableció fuera de toda duda que durante ocho o nueve años antes de su muerte Antonio Albino y su familia vivieron en la finca, habiendo sido él colocado allí por Galarza, como mayordomo; y que durante todo ese tiempo la familia Albino reconoció a Galarza como dueño del inmueble. Aun cuando aceptáramos que la evidencia excluída fuera suficiente para establecer el más perfecto título de dominio a favor de la Sucesión Pierantoni, ese título no bastaría para justificar la entrada forzosa *vi et armis,* que el acusado y sus hermanos realizaron el día de autos. La entrada en la finca en las condiciones establecidas por la prueba fué un acto injustificado de violencia que Albino y sus familiares tenían derecho a rechazar usando de la fuerza razonablemente necesaria para la defensa de sus vidas y de su hogar.

Las manifestaciones del Juez al excluir la evidencia referente al título, supra, son una correcta exposición de la ley y en nada pudieron perjudicar los derechos del acusado.

El quinto señalamiento es de una frivolidad tan patente, que deberíamos desestimarlo sin siquiera exponerlo. Se queja el apelante de que la corte inferior no le permitiera repreguntar por segunda vez al testigo Pedro Albino sobre ciertas alegadas instrucciones específicas dadas a su padre por Galarza, el dueño de la finca. Bastará decir, para justificar la desestimación de este señalamiento, que del récord

aparece que el Juez preguntó a dicho testigo si él sabía si Galarza le dió alguna instrucción a su padre, y que el testigo respondió: "No señor, porque ellos cogían para la finca a voltearla y nosotros a nuestro trabajo independientemente."

▊▊ Que la corte inferior erró al hacer comentarios sobre las características de un "dying declaration", y al admitir la de Antonio Albino, Jr.

Del récord aparece que al ser ofrecida por el fiscal la declaración de la víctima, se opuso la defensa a su admisión, haciendo constar que se oponía "no porque entendamos que nos perjudica en sí, porque la prueba es bastante clara en cuanto a cómo ocurrieron los hechos, sino porque como cuestion de derecho es inadmisible."

La declaración en cuestión fué prestada por Albino ante el fiscal, en el hospital, el mismo día en que fué herido, o sea el 9 de marzo de 1938. El herido falleció el día once del mismo mes, a las 2 P. M. y la autopsia fué practicada esa misma tarde. La defensa admitió la autenticidad de la declaración ofrecida en evidencia y que ella contiene una exposición fiel y exacta de lo declarado por Albino, pero insistió en que la misma no era admisible como dying declaration.

Después de oír la argumentación de las partes, la corte se expresó así:

"La característica de una declaración, un *dying declaration,* o sea una declaración en peligro de muerte, es que el individuo que la da, tenga la creencia en el momento que la da, que se va a morir, por eso hasta en un verso se ha dicho, que al borde de la tumba, ni el más villano miente. Esa es la filosofía de la declaración. De modo que aquí en esta declaración, la corte la ha leído, y encuentra que de la declaración aparecen todos los requisitos necesarios, que el declarante creía que se encontraba en peligro de muerte... La corte cree que es admisible y la admite por entender que reúne los requisitos que exige la ley y la jurisprudencia para hacerla admisible."

Al terminar la corte de exponer la regla sobre admisión de "dying declarations", la que encontramos ajustada a la

jurisprudencia sobre la materia, la defensa formuló de nuevo su oposición, en la forma siguiente:

"Nosotros vamos a solicitar que se reconsidere esa resolución, y perdone el sapiente juez que nos escucha. *Hay un requisito que no se cumple, el requisito que se exige, que lo es el requisito de contemporaneidad.* Es decir, el requisito que ha transcurrido mucho tiempo desde que se cometieron las heridas al tiempo en que se hizo la declaración. Es decir que han transcurrido me parece que dos días después. Esa declaración tiene que ser hecha precisamente, contemporánea, más o menos, en el sitio de los sucesos.

"Si inmediatamente, por ejemplo, que el fenecido Albino recibió la herida hubiera hecho la declaración, pues ya entonces tendría la importancia de contemporaneidad, porque entonces no tendría él oportunidad de fabricar el testimonio." (Itálicas nuestras.)

La declaración admitida en evidencia, tomada el 9 de marzo de 1938, dice así:

"DECLARACIÓN DE ANTONIO ALBINO, JR.—(Marzo 9, 1938) Fiscal (Rodríguez Serra) Levanta la mano derecha. ¿Tú juras decir la verdad? R.—Sí, señor. P.—¿Cómo tú te llamas? R.—Antonio Albino. P.—¿Dónde vives? R.—En la Jagua de Peñuelas. P.—¿Cómo tú te encuentras? R.—Mal. P.—¿Pero mal en el sentido de que te puedes morir de esa herida? R.—Sí, tengo un dolor que no puedo resollar. ¡Ay Dios mío! P.—¿Quién te hirió a ti? R.—Juanito Pierantoni. P.—¿Y a quién más hirió? R.—Al papá mío. P.—¿Cuántos disparos le hizo al papá tuyo? R.—Yo no sé decir. P.—¿Y a ti? R.—Uno. P.—¿De modo que allí dispararon dos personas solamente?—Sí, señor, dos, ahora habían más; yo corrí. P.—¿Cuántos tú viste disparar? R.—Disparó Vicente cuando yo corrí. P.—¿A quién le disparó? R.—A papá. P.—¿Y a ti, quién te disparó? R.—Juanito. P.—¿Tú viste qué armas tenían Vicente y Juan Pierantoni? R.—Revólver. P.—¿Tú viste si era pistola? R.—No. P.—Tú crees que te vas a morir? R. ¡Ay Dios mío!..."

De la oposición formulada por la defensa, supra, después de oír la regla expuesta por la corte, se ve claramente que la objeción a la admisión de la declaración de Albino no se basó en que éste en el momento en que declaraba no creía que se iba a morir, y sí en que la declaración había sido prestada dos días después de haber el declarante recibido la herida

que le causó la muerte.    Si la contemporaneidad o proximidad entre el momento de recibir la herida y el momento de prestar la declaración fuese, como erróneamente sostiene la defensa, el requisito esencial para la admisibilidad de una declaración en peligro de muerte, tendríamos que resolver que ese requisito se cumplió en el presente caso, pues de la evidencia aparece que Albino fué herido como a la una de la tarde del día 9 de marzo de 1938 y declaró esa misma tarde. Como muy bien resolvió la corte inferior, la fecha en que se prestó la declaración carece de importancia, pues no se trata de una declaración ofrecida como parte del res gestæ. Lo realmente importante es que en el momento én que declaraba el herido creía que iba a morir como consecuencia de la herida recibida.    Las contestaciones dadas por el herido al fiscal indican claramente que en ese momento el declarante tenía la creencia de que iba a morir.

No erró la corte inferior al admitir la declaración.    Además, y en eso convenimos con la defensa, dicha declaración en nada pudo perjudicar al acusado, toda vez que tanto la prueba de cargo como la de descargo demuestran fuera de toda duda que la herida que causó la muerte de Albino fué inferida por el acusado Juan Pierantoni.    Véanse: *Pueblo* v. *Ortiz,* 42 D.P.R. 135; *Pueblo* v. *Mejías,* 47 D.P.R. 282; *Pueblo* v. *Quirós,* 48 D.P.R. 962; y *Aguilar* v. *Pueblo,* 49 D.P.R. 668.

Después de haber declarado Alfonso Maldonado, perito en balísticas, sobre la aplicación de parafina al acusado, con un resultado positivo en 19 puntos, a Vicente Pierantoni, con resultado positivo en 34 puntos, y a los cadáveres de Albino padre y Albino Jr., con resultado negativo en ambos casos, la defensa formuló la siguiente pregunta:

"¿Es posible, perito, que una persona que haya disparado un arma de fuego evite con ciertos remedios, por ejemplo, ácido, etc., a fin de que no dé prueba de parafina?"

No erró el tribunal al sostener la objeción del fiscal.⁻ La pregunta, además de ser inmaterial, no era germana con las

preguntas formuladas por el fiscal en el examen directo del perito.

■ Los señalamientos noveno, décimo, y décimoprimero, son claramente frívolos y deben ser desestimados sin que nos, detengamos a exponerlos y discutirlos.

■ Estos tres señalamientos están relacionados con la declaración del testigo de la defensa, Erasmo Gotay, policía insular.

El primer incidente de que se queja el apelante es el mismo que hemos discutido y resuelto al considerar el segundo señalamiento.

El segundo ocurrió así: al resolver el juez que las manifestaciones que hiciera la viuda de Albino al policía, a las 10 de la noche, o sea nueve horas después del suceso y cuando todo estaba en calma, no eran admisibles como parte del res gestae, el testigo, sin que nadie se lo preguntara, interrumpió a la corte, diciendo: "Ella me declaró . . ." Fué entonces que el juez dijo al testigo:

"No diga, nadie le ha preguntado. Usted parece que tiene interés en declarar en cierto sentido. La corte está resolviendo una cuestión. Usted quédese callado. El abogado es el único que puede discutir y hablar de todo eso. El testigo se queda callado hasta que se le pregunte."

Veamos el tercer incidente. Habiendo declarado el policía Gotay que cuando practicó la investigación ocupó cinco machetes envueltos en un saco, en el cielo raso de la casa, la defensa le preguntó: "¿Ocupó cinco machetes?" El testigo respondió: "Cinco machetes, dos de ellos tenían manchas de sangre." Se opuso el fiscal porque la contestación era oficiosa, toda vez que nadie le había preguntado si los machetes tenían sangre o no; y solicitó su eliminación, porque no siendo el testigo un químico no estaba capacitado para declarar si las manchas eran de sangre. En momentos en que la corte repetía a la defensa lo que el testigo había contestado a su pregunta, volvió éste a interrumpir al juez, diciendo:

"¿La corte me permite una cosa?" A esta pregunta siguió el diálogo que copiamos de la transcripción de evidencia:

"JUEZ: Espérese un momento. Usted no es abogado.

"TESTIGO: Pero en defensa de mi reputación.

"JUEZ: Nada de reputación. Aquí usted es un testigo y no puede discutir ni con la corte, ni con el abogado. Espérese y si no se quiere callar yo lo haré callar. ¿O usted quiere imponerse a la corte? Yo quiero que usted me conteste esa pregunta.

"TESTIGO: Yo no quiero imponerme a la corte. Yo como un oficial de la policía quiero aclarar la verdad.

"JUEZ: Recuérdese que está en la Corte de Distrito de Ponce, que no está en el barrio de la Jagua y que aquí usted es un testigo, porque muchas veces se cree uno que su autoridad en un barrio, en una corte de distrito también puede ejercer esa autoridad. Aquí la única autoridad presente ahora, soy yo, en nombre de la Ley, el Juez. Usted está vestido de policía, pero usted tiene que observar todas las reglas de la corte lo mismo que los demás testigos, porque si no se expone a la pena que le señala la ley para los que no obedecen las reglas de la corte. De modo que, si usted tiene en la cabeza algún humo de autoridad, sáqueselo ahora hasta que salga de la corte. ¿Usted me entiende bien?

"TESTIGO: Sí, señor.

"JUEZ: De modo que considérese igual a cualquier otro testigo de los que pasan por esta silla. Cuando usted esté declarando, usted explique eso que acaba de decir, pero no intervenga en las discusiones. ¿Usted me entiende bien?

"TESTIGO: Sí, señor.

El lenguaje usado por la corte al dirigirse al testigo es en verdad duro y severo. Empero, para poder determinar si la corte estuvo justificada al expresarse en la forma en que lo hizo sería preciso haber observado la actitud y los gestos del testigo al dirigirse al tribunal. Careciendo de esos elementos de prueba, no estamos en condiciones para poder resolver si la corte estuvo justificada o no al dirigirse al testigo en la forma en que lo hizo.

Lo dicho por la corte al testigo nada tenía que ver con la credibilidad de éste, y en nada pudo perjudicar al acusado. Además, del récord aparece que después de todos esos incidentes que hemos apuntado, la corte declaró sin lugar la eli-

minación de la contestación del testigo y permitió que éste declarase extensamente con referencia a las manchas de sangre que a su juicio aparecían sobre dos de los cinco machetes ocupados por él.

■ Se queja el apelante de varios incidentes, todos ellos sin importancia, ocurridos durante el curso de la declaración del policía Gotay. En todos ellos las objeciones de la defensa fueron sostenidas por la corte. No hubo perjuicio para el acusado.

■ Que la corte erró al permitir a un jurado hacer comentarios sobre la prueba, antes de que el caso fuera sometido a su consideración.

He aquí lo currido. Durante el examen del policía Gotay, el abogado defensor pidió a la corte que ordenara que el Diario de Novedades del Cuartel de la Policía de Peñuelas fuese traído para ser presentado en evidencia con el propósito de eliminar cualquier duda y para corroborar la declaración del citado testigo. Manifestó la corte que no creía que el Diario fuera necesario pues ya el testigo había declarado, sin oposición del fiscal, sobre su contenido. Intervino entonces uno de los miembros del jurado, diciendo:

"En cuanto a eso yo tenía en mente hacer una solicitud algo parecida, por cuanto el Hon. Juez de Paz dijo que él había ordenado a la familia del interfecto que condujeran a su presencia los machetes, él como autoridad, y luego la otra autoridad que estuvo allí y declaró algo contradictorio, que dijo que personalmente trajo los machetes y dió entrada al libro. De manera que viendo el libro se sabe cuál de los dos está en la verdad."

La corte declaró con lugar la petición de la defensa diciendo:

"Entonces, a petición del jurado y de la defensa, y con la conformidad del fiscal, la corte ordena que se traiga el Libro de Novedades del Cuartel de la Policía de Peñuelas, comenzando el día 9 de marzo de 1938."

La queja del apelante carece de fundamento. Su abogado pidió el libro para eliminar cualquier duda y para que la en-

trada en el mismo sirviera de corroboración a lo declarado por su testigo, el policía Gotay. El jurado secundó su solicitud para resolver el conflicto entre lo declarado por Gotay y lo dicho por el juez de paz en cuanto al encuentro de los machetes. La intervención del jurado lejos de perjudicar al acusado le fué beneficiosa, pues sin ella seguramente la corte no hubiese admitido el mencionado libro.

█ La sentencia declarando al acusado culpable de un delito de portar armas está justificada por la evidencia. Ella demostró que el día del suceso el acusado y sus hermanos salieron de Ponce y fueron a la finca, en Peñuelas, donde Albino y su familia residían desde hacía unos ocho años. Al ocurrir la discusión entre Albino y los Pierantoni, dos de éstos, Vicente y Juan, sacaron los revólveres que portaban y dispararon contra los dos que resultaron muertos. El mero hecho de que los Pierantoni creyesen tener algún título sobre la finca, de la cual no habían estado en posesión durante los ocho años anteriores, no les autorizaba para portar armas desde Ponce hasta el sitio del suceso en Peñuelas.

La prueba aducida por el fiscal demuestra fuera de toda duda la comisión de un delito de asesinato. Y si ése hubiese sido el veredicto del jurado y la sentencia de la corte, no dudaríamos un momento al confirmarlos.

*Las sentencias recurridas deben ser confirmadas.*